Kenneth N. **JUHL**

v.

The **UNITED STATES.**

No. 353–65.

United States Court of Claims.

Oct. 13, 1967.

Francis J. Steiner, Jr., Washington, D. C., attorney of record, for plaintiff.

Charles M. Munnecke, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

NICHOLS, Judge.[*]

This is an action by Sergeant Juhl, an enlisted career man in the Air Force, to recover back pay and forfeitures he has lost as a result of his conviction, after trial, by a General Court Martial. His counsel asserts on his behalf that the conviction was contrary to the constitution and invalid on several grounds. We hold that the court martial lacked jurisdiction to convict because it was prohibited from so doing by Section 153a, Manual For Courts-Martial, 1951, which declares that "a conviction cannot be based" upon the "uncorroborated testimony of a purported accomplice," when such testimony was "self-contradictory, uncertain or improbable." The conviction of Juhl was so based. In our opinion, the Congress in substance has declared that such a conviction would be fundamentally unfair. Therefore, it is exposed to collateral attack notwithstanding the statutory provisions for finality in 10 U.S.C. Sec. 876, Article 76 of the Act of May 5, 1950, Public Law 506, 81st Cong., 64 Stat. 108. This conclusion makes it unnecessary to consider other grounds the plaintiff relies on, and we do not do so.

■ To explain the basis of our conclusion it is necessary to consider the facts in some detail. We do not weigh the evidence in order to determine guilt or innocence but simply recite it to determine whether it includes anything that supports the result, within the rule referred to above.

The plaintiff before his conviction had the rank of Master Sergeant. His record included 22 years service in the armed forces and he had several decorations for bravery in action. He was an air policeman, apparently the equivalent of a military policeman in the Army. He was stationed at the R.A.F. air base at Lakenheath, England, which was at that time in use by the United States Air Force as an operating base. He had a number of air policemen serving under his command, including the purported accomplices subsequently mentioned.

The Air Force, like the other armed services, maintains exchanges on its bases on foreign territory where uniformed personnel and their dependents may purchase consumer articles, free of taxes and customs duties of every kind, including those of the United States and of the host country. This is an important fringe benefit, particularly for persons stationed in the United Kingdom, where the local taxes and duties on such articles as tobacco products and liquor are stiff. To avoid abusing the hospitality of the host country it was necessary for the Air Force to make certain that excessive quantities of AFEX (Air

---

[*] This case was referred to Trial Commissioner C. Murray Bernhardt who submitted a proposed opinion, findings of fact, and a recommended conclusion of law, pursuant to the order of reference and Rule 57(a). We acknowledge great assistance from the proposed opinion but we reach the same result by a different route. We agree with the conclusion of law and adopt it as our own. We adopt the findings of fact with minor revisions, omitting, however, those that relate to the contents of *ex parte* affidavits before the Board For Correction of Military Records.

Force Exchange) merchandise did not find their way into the United Kingdom economy. To accomplish this, local Air Force regulations limited each airman and each dependent, e.g., to a quota of 4 cartons of cigarettes a month, with like quotas on other tobacco products and liquor. Each serviceman and each dependent had a ration card issued, which had to be stamped and punched by the salesgirl at the AFEX on each purchase to show by how much the monthly quota was depleted. All personnel were forbidden to possess AFEX merchandise in excess of reasonable quantities, or to barter or sell such merchandise to persons not having such privileges. There was apparently no provision against giving AFEX merchandise away, and in light of this, the standards as to what quantities were reasonable to possess, at one time, were not clear. Apparently, it was, at least tacitly, permitted for persons having exchange privileges to purchase with other persons' ration cards as well as their own, purportedly to turn over the purchases so made to such other persons.

About June 1961 an informant, whose name does not appear in the case, disclosed to the Air Force that airmen were purchasing excessive quantities of AFEX merchandise and selling it to British civilians, at advances in price; in other words, they were maintaining a black market. Investigation soon implicated many persons, among whom were air policemen who should have been enforcing the law. Three persons in all informed against the plaintiff, of whom two were the purported accomplices who afterwards testified against him, and one testified but in his favor. Some of the accused airmen were tried and convicted by the British for offenses against their customs laws, and as to others, including plaintiff, the British executed a waiver which, in effect, surrendered them to their own Service for trial and punishment. Plaintiff's two purported accomplices, Airmen Shields and Hughes, were both already convicted and in custody when plaintiff was tried.

The charges and specifications served upon plaintiff in accordance with military procedure are set forth in full in the findings. Two of the specifications named Airman Shields as an accomplice. The evidence on these specifications was given to the Court Martial by Airman Shields and apparently was not convincing, as the tribunal acquitted plaintiff on these specifications. Therefore, they need not be considered further. Shields also gave, what might be called consciousness of guilt evidence, namely, an effort by plaintiff to get him to alter his testimony. Doubtless the Court Martial considered this as relating only to the specifications under which Shields was the accomplice.

The tribunal also acquitted the plaintiff of two other specifications where Airman Hughes was the purported accomplice. These included specifications that plaintiff purchased 6 transistor radios, in excess of reasonable amounts, and that he sold Air Force merchandise—two cartons of cigarettes—to an English civilian, a Charles R. Cox, who did not have exchange privileges.

The Court Martial convicted plaintiff of the remaining six specifications. It will be convenient first to consider specification 4 which charged him with acquiring cartons of cigarettes and boxes of cigars at the AFEX in an irregular manner. Hughes testified that he introduced plaintiff to certain British female employees of AFEX who thereafter, in his presence, contributed to plaintiff's making irregular purchases by not punching his ration card or, if someone was looking on, by punching through a hole that was already punched. The Air Force had written statements by both of the females which in general supported this charge. However, on the stand they testified they had made irregular sales to Hughes only, not plaintiff, and when plaintiff purchased in apparently large quantities, it was due to his presenting other persons' ration cards as well as his own. They explained the prior statements as due to pressure by investigators and fear of losing their jobs. They had

lost their jobs anyway at the time of plaintiff's trial. The written statements were not received in evidence. It is clear that their evidence did not corroborate that of Hughes, unless contradiction is conceived to be corroboration.

■ Specification 7 stated that plaintiff, in conjunction with Hughes, transported 50 boxes of exchange cigars, in excess of reasonable amounts, between the Lakenheath base and Brandon, Suffolk, England. The testimony was as follows: Hughes testified that he and plaintiff traveled together, in a Volkswagen, owned by another airman, to a certain Airman Squire's home at Brandon, because Squire had told him that he had a customer who would buy the cigars. At Squire's home, Hughes and Squire removed the boxes from the boot or trunk (which, of course, in a Volkswagen is in front). At the preliminary investigation under Article 32 of the Code, Hughes testified that plaintiff remained in the front seat of the car or stood beside it during the unloading. At the trial he testified that plaintiff acted as look-out on the road to be sure that no one surprised them. Plaintiff testified in his own behalf that he made the trip as alleged but knew and saw nothing of any contraband being in the car. Upon arrival at Squire's home he said he went to the front yard and sat with Mrs. Squire (it was June) having a drink of beer. He said that he could not possibly have seen anything coming on the road from where he was sitting. Squire testified for the prosecution but nevertheless stated that the arrangement to bring him the cigars was made with Hughes and the appearance of plaintiff surprised him; that he and Hughes unloaded the cigars from the car; that plaintiff sat, during that time, in the front yard with Mrs. Squire; and that plaintiff was in a position where he could not see the car or act as a look-out. A few days afterwards Squire heard of the investigation and threw away the cigars on a public road, so that they would not be found in his possession. He said nothing to implicate Juhl beyond his mere presence. There was no material variation in plaintiff's story and Squire's and nothing significant was brought out on cross-examination of plaintiff respecting this specification. Mrs. Squire did not testify; an affidavit she furnished later indicates she would not have corroborated Hughes if she had testified. When, as here, an accused testifies in his own behalf, he may of course, inadvertently corroborate the accomplice or make admissions that furnish corroboration. Nothing of the sort happened in this case.

Specification 3 charged that plaintiff, in conjunction with Hughes, sold 140 boxes of Air Force Exchange cigars to a person, not having exchange privileges, at Southend, Essex, England. Hughes testified to the occurrence of two transactions that would meet this description. He said an Airman Wainwright gave him a number to call at Southend, although in the preliminary investigation he had said that plaintiff had given it to him. Eventually he settled for the version that he and plaintiff jointly together got the number from Wainwright. Wainwright did not testify. He furnished an affidavit later which denied he ever gave a telephone number for such a purpose to anyone. After Hughes had called the number, on a Friday night, the next day, he testified, he and plaintiff drove in his Volkswagen to Southend, met their contact at a parking lot and went with him to a structure used by a dairy as a garage for milk trucks. There they transferred the cigars and received payment. The purchaser was not identified and did not testify. Obviously, the occurrence of this incident stands on the authority of the accomplice Hughes' testimony alone. Plaintiff denied that he participated in any such trip or transaction.

We now come to the most curious part of the case, the Southend trip of about a week later, June 17th. This time there were several others in the party and two cars were used. Hughes and his wife went ahead in his Volkswagen, taking their two dogs. (The dogs had been his daughters in the Article 32 investigation.) Plaintiff drove his car, a Chevro-

let, and carried with him Mrs. Juhl, their four sons and an Airman Herron, in whose quarters the contraband had been kept the night before, so Hughes testified. The cigars, he said, travelled to Southend in plaintiff's trunk, or boot, under a blanket. Varying what he said at the Article 32 investigation, Hughes now said they had 20 transistor radios too. The whole party stopped on the way to Southend at an antique shop in a place called Sudbury, where they purchased a Life of Christ and two snake like candle holders with sharp points. They then continued to Southend where both cars stopped near a Chinese restaurant. According to Hughes, the two women took the children and the dogs into the restaurant. Plaintiff, Herron and he then travelled in plaintiff's car to the dairy garage, delivered the cigars, were paid, and returned to the restaurant. Plaintiff went in waiving a big wad of English currency and handed some of it over to Mrs. Juhl. The ladies then went shopping and the men took the children to an amusement park. Southend is on the water and is a common resort for holiday making Londoners. In the late afternoon or evening they returned to the Base and had a snack there for supper. Plaintiff denied going to the dairy garage or anywhere else in his car after leaving the ladies at the restaurant. He said that the purpose for separating before lunch was so that Hughes could walk the dogs, and that two of the boys were with them. After they had joined the ladies in the restaurant he gave Mrs. Juhl five pounds ($14.00) for shopping. Mrs. Juhl testified for the defense and supported her husband's version. The boys did not testify.

There was ample reason in the evidence to surmise that both Hughes' had an interest in obtaining a conviction. He had already been tried by Court Martial and sentenced, but by some contriving he was kept on the Base to do light office work, instead of the hard labor his sentence called for. He had been released from custody for Christmas. The inference was inescapable that the continued lenien-

cy of his future treatment was likely to be contingent on the conviction of his alleged accomplices. Under these circumstances, naturally, attention focuses on Airman Herron as the only disinterested adult, admitted by Hughes not to be a participant in the sale, even though Hughes had him providing stowage for the contraband the night before, and coming with them tc the garage. Herron had been returned to a base in the United States shortly after this Southend trip. He had had correspondence with the defense and defense counsel, and the OSI had interviewed him. The defense requested that he be returned to Lakenheath as a defense witness and the Air Force ordered him there. He arrived in London one evening, was met by two representatives of the prosecution, and interviewed at length and until late. The following day he went on the stand. It was clear, therefore, that he would have had little or no opportunity to concert a story with the accused, plaintiff here, except by the risky method of written correspondence. He said he knew nothing of any contraband. His testimony affirmed the plaintiff in every detail and contradicted Hughes in every respect where his story differed from plaintiff's. He said that after the party had left Sudbury the children started playing with the candle holders. This their parents thought might be dangerous because of the spike points, so they stopped the car and Herron opened the trunk and put the candle holders in it. He saw no boxes of cigars and nothing was covered up by a blanket. So far as he was aware the trip was entirely what it purported to be, an innocent family outing.

Mrs. Hughes was put on the stand for rebuttal after the defense rested. Her story was partly favorable to plaintiff, in that he did not wave his English currency around when entering the restaurant as if bragging of a financial coup. Rather, he simply pulled a roll out of his pocket while seated, apparently, when Mrs. Juhl asked for money. (The Juhls' said they got English currency at the Base, and their purchases at Sudbury

confirm they must have had some then.) One statement or Mrs Hughes', ironically brought out by defense cross-examination, is the nearest thing to corroboration of Hughes the case affords. She said that when she was with Mrs. Juhl in the Chinese restaurant, before the men joined them, for some reason she looked out on the street and the plaintiff's car was gone. According to plaintiff and Herron, the car was not moved. She was, however, then or recently a German national and her mastery of English was imperfect. It was not clear whether the car had really been moved from where she had seen it parked or whether she had been uncertain as to its original location. There is no more dangerous witness than a foreign national whose English is only just good enough for him or her to be denied the help of an interpreter. The Law Officer made it of record (R 426) that she had difficulty understanding and was difficult to understand.

However, her testimony suffers from a more dramatic infirmity. It was brought out on cross-examination that she was living near the Base and when an air policeman went to pick her up to testify, Airman Hughes was with him. The policeman, Sergeant Stedley, overheard enough of the ensuing conversation and repeated it, to make it perfectly clear to us that Airman Hughes, in the guise of questioning her about her recollection of the Southend trip, was actually coaching her as to what to say. At the conclusion of Airman Hughes' testimony in Juhl's Court Martial the legal officer (*i. e.*, the judge) had given him the following instructions:

> LO: Airman Hughes, you are excused but subject to being recalled as a witness. You are instructed not to discuss your testimony in this case with anyone except counsel or the accused. You will not allow any witness in this case to talk to you about the testimony which he has given or which he intends to give. If anyone other than counsel, these two captains here—

Witness: Right, sir.

> LO:—or the accused even attempts to talk to you about this case or about your testimony in this case, you should make the circumstances known to Captain Lee. (Captain Lee was the prosecutor.)

While there is no evidence that the prosecution ordered this flagrant violation of the court's instructions, it was in a position to see to it that they were observed, since Hughes was in custody, and manifestly it should have done so. Considering all the circumstances, we feel compelled to regard Mrs. Hughes' testimony as utterly devoid of probative value, at least as evidence for corroboration of Airman Hughes' testimony, since it is really Airman Hughes' testimony through another's mouth.

As in the case of Shields, Hughes testified to some statements by plaintiff possibly indicative of consciousness of guilt, but Juhl denied making such statements and they were not overheard by any impartial persons.

There were three other specifications not already mentioned, but the evidence to prove them was only the acts and transactions already described. Charge I, Specification 1 was conspiracy; Charge II, Specification 2 was for possession of Air Force Exchange merchandise, 140 boxes of cigars, in excess of reasonable amounts. This was apparently the same merchandise which plaintiff was charged with having sold in Specification 3. Charge II, Specification 9 was for dereliction in the performance of duties as noncommissioned officer in charge, in that plaintiff knew of black market activities by his subordinates and wilfully failed to apprehend them or report them. There was no evidence of plaintiff having such knowledge, except in the instances already described and those of which he was acquitted.

■■ The requirement of corroboration does not mean that the corroborating evidence should cover every element of the offense so as to be sufficient for conviction apart from the accomplice's

testimony. Christy v. United States, 261 F.2d 357, 17 Alaska 107 (9th Cir. 1958), cert. denied 360 U.S. 919, 79 S.Ct. 1438, 3 L.Ed.2d 1535 (1959). In the circumstances, it should not 'consist merely of indifferent facts, but should in some manner connect the accused with the offense. Arnold v. United States, 94 F.2d 499, 507 (10th Cir., 1938); Keliher v. United States, 193 F. 8, 15–16 (1st Cir., 1912); United States v. Howell, 56 F. 21, 39 (W.D.Mo., 1892), appeal dismissed, 163 U.S. 690, 16 S.Ct. 1202, 41 L.Ed. 315 (1896).

■■ Corroboration cannot be found in the mere presence of the accused near the scene of the crime. People v. Mullens, 292 N.Y. 408, 416, 55 N.E.2d 479, 482, motion denied, 293 N.Y. 768, 57 N.E. 2d 845 (1944); O'Quinn v. State, 43 Okl. Cr. 372, 279 P. 358 (1929). In the Brandon transaction there was corroboration that a crime was committed. The accused was admittedly near the scene of that crime, but his presence had an explanation consistent with innocence. If, e. g., the car in the Brandon transaction had carried illicit heroin, corroboration might arguably be found—as the Government argues—in what might be thought the unlikelihood that the admitted offenders would allow anyone not having complicity to be or to travel with them during commission of the offense, with all the risk of exposing the crime accidentally. Here, however, Hughes clearly did not see the cigars as dangerous in that way, as shown by his taking a non-participant (admitted by him to be such) with him in the second Southend transaction. In the absence of other corroboration, it cannot therefore be found in Juhl's merely being near the cigars, which he said he was not aware of and did not see.

■ In the second Southend transaction, Juhl's story and Hughes', as we have seen, differed more widely. If Juhl told the truth, he did not deliver any contraband and neither did Hughes. No crime was committed. Conceding arguendo that corroboration might be found in any instance, however, minute, where testimony of others, or circum-stances, confirmed Hughes' version and refuted Juhl's, there was no such instance except the tainted testimony of Mrs. Hughes. There was no corroboration that a crime was committed, still less that Juhl participated in committing it.

■ We have also considered whether Airman Hughes' testimony was self-contradictory and are of the view it was so beyond all doubt. When first suspected, Hughes was interviewed by the OSI officers and denied all participation in black market activities. Later, on the 18th of July, he gave a statement to a Captain Miller in which he admitted black market activities on a large scale and implicated numerous persons, including plaintiff. At his Court Martial he again denied all participation in black market activities and claimed that his statement to Captain Miller had been obtained by improper coercion. At plaintiff's Court Martial Hughes blandly agreed that what he then testified to was entirely contrary to what he had said at his own trial, and he explained the latter as having been on the advice of some unnamed British lawyers. It is not clear whether these lawyers advised him to testify contrary to the truth or whether they based their advice on Hughes' own statements to them. If, however, it is thought that self-contradiction must be found within the four corners of the same proceeding, it should be noted that the proceeding in this, as in other Courts Martial, includes a preliminary investigation under Article 32 of the Code in which witnesses testify under oath. This is a discovery proceeding and the right of an accused to rely on any conflict between prosecution testimony there and at the trial is manifestly intended. There are in this case very important contradictions between Hughes' testimony in plaintiff's Article 32 investigation and that in plaintiff's trial. Thus there is contradiction whether the plaintiff Juhl or Airman Wainwright was the source from whom Hughes obtained the Southend contact's telephone number. There is self-contradiction as to whether they carried tran-

sistor radios as well as cigars on the second Southend trip. In his testimony about the Brandon trip there is self-contradiction whether the plaintiff sat in the car while the contraband was unloaded or acted outside it as a look-out. Squire's own testimony at the preliminary investigation had plaintiff out of and away from the car and that is undoubtedly why Hughes changed his version. It would appear, however, that if a person contradicts himself—anything he ever said—in his trial testimony, that testimony is self-contradictory. In ordinary speech the fact that a person contradicts himself is not limited as to time or transaction and there is nothing to show the requirement of the Manual with respect to self-contradiction was not intended to be understood as it would be understood in ordinary speech. In United States v. Haderlein, 118 F.Supp. 346 (N.D.Ill., 1953), the testimony of an alleged accomplice was held to be self-contradictory by reason of conflicting testimony previously given under oath before a grand jury.

The Government cites the statement of a Board of Review in United States v. Jones, 15 CMR 664, 671 (1954), to the effect that testimony is not "self-contradictory" if the inconsistency is with statements made prior to the trial and the trial testimony itself is consistent; such prior statements are to be considered only in assessing the witness' credibility. The Board of Review cites no authority for this position. If it is valid, we believe its validity is limited to the case before the Board where, unlike the one at bar, the witness, in his testimony, does not expressly refer to his former statements and then expressly contradict them, that is, when one would have to go outside the witness' trial testimony itself to determine that he had contradicted himself. In any event, the Board of Review found no *significant* inconsistency in the testimony before it. It characterized the statements in question as "*minor* inconsistencies as to dates, places and circumstances pertaining to the offenses charged," ibid., and said

that the witnesses themselves had explained the inconsistencies away. In the case at bar that was not so. Here, as in *Haderlein,* supra, and unlike *Jones,* the utter inconsistencies of Hughes' prior sworn testimony was exposed and blithely admitted in Hughes' testimony at Juhl's trial itself. Other than *Jones,* no case pertinent to this issue has been cited to us. (Emphasis supplied.)

 In a Military Court the function of the Law Officer, vis-a-vis the rest of the Court, much resembles that of the Judge in a civilian trial, vis-a-vis the jury. He admits or excludes evidence and instructs the president and other members of the court on the law just as a judge would do. The record in this case includes a conference about instructions between the Law Officer and counsel, out of the hearing of the rest of the court. The following colloquy occurred:

> LO: It's my understanding, now, that the accused does not want instruction on accomplice testimony.

> DC: That is correct, sir. This was not the theory of the defense.

Defense counsel had, of course, laid great stress on impeaching the purported accomplices, Hughes and Shields, and apparently saw some inconsistency between his approach to the case and the instruction, whatever it was, that the Law Officer would have given. Defense counsel knew his way around court martials and his resourcefulness and zeal in behalf of his client were worthy of praise. Therefore, it is necessary to suppose he had in mind a purpose or reason the record now before us does not disclose. Apparently he had had an unrecorded conference with the Law Officer on the same subject. The record reflects a conscientious effort by the Law Officer to protect the rights of the accused and doubtless he would have delivered, if requested, an instruction built around Section 153a, only unfortunately he acquiesced in the theory that it was not required in the plaintiff's interest.

After the conviction of the plaintiff, as indicated, on 6 of the 10 Specifications, the Court Martial proceeded in due course to impose sentence which was that the accused would be reduced to the grade of airman basic, would forfeit $55.00 a month, and would be confined at hard labor for 6 months. He actually forfeited $43.00 per month, but he served most of the 6 months at hard labor.

■■■ The record before us includes an extended review of the case by a Staff Judge Advocate which was the nearest thing to appellate procedure that the plaintiff had a right to, or actually had. With regard to the accomplice rule all he says is the following:

I note that no instruction on accomplice testimony was given. In view of the other instructions and the issues that were clearly drawn for the court's decision, no such instruction was necessary. Further, the defense specifically declined it (R. 454). The accused was not prejudiced by the fact that the instruction wasn't given.

It would appear to have been the position of the Staff Judge Advocate that the lack of instruction on accomplices was not prejudicial in view of the extended instructions on impeachment. The main thrust of the effort of defense counsel was to impeach the accomplice witnesses, Hughes and Shields. However, the absence of prejudice to the accused is by no means as apparent to us. The purport of the accomplice rule is that a conviction upon the uncorroborated testimony of an accomplice, if the said testimony is "self-contradictory, uncertain or improbable," is not allowed. The effect of Hughes' self-contradictory statements, considered merely as impeachment, was that the triers of facts could choose whether or not to believe what he said before them, *i. e.,* they could decide whether the witness was, in fact, impeached or not (R. 459, 468). The effect of the accomplice rule would seem to be that in a case covered by the rule the determination of guilt would have to be taken away from the fact-finders and they could not render a verdict of guilty

whether they believed Hughes was telling the truth now or had told it before.

■■■ That is one reason why in this case counsel's refusal of an instruction on accomplice testimony did not constitute a waiver of the point. If, as we hold, judgment in favor of the plaintiff should have been directed by the law officer on this ground, there was no need or place for an instruction which would have left it up to the court-martial members to decide for themselves whether or not Hughes' testimony was corroborated and if not whether or not it was "self-contradictory, uncertain, or improbable." Under our view of the case these were not issues to be given to the fact-finders. Neither plaintiff nor his counsel ever indicated that they were deliberately waiving application of the accomplice rule by the law officer.

The appellate review within the military system does not appear to have been such as to require us to keep hands off under the standards set forth in Burns v. Wilson, 346 U.S. 137, 144, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), that is, that we would be going over matters they have fully considered.

■■■ In case of mere error, in admitting or excluding evidence or instructing a jury, the failure of counsel to object of course has the normal consequence of barring even a direct appellate reversal, and this holds good as to collateral attack on a court martial when the ground of attack is failure to give full and fair consideration to procedural safe-guards deemed essential to a fair trial. Bennett v. Davis, 267 F.2d 15 (10th Cir., 1959). The rationale is that the tribunal cannot be said to have "refused to consider" a point not urged. Bishop, Civilian Judges and Military Justice: Collateral Review Of Court-Martial Convictions, 61 Col. L.R. 40, 62 (1961). Here, however, the defect is, we believe, jurisdictional on other grounds, as we will show, and the normal rule applies that a jurisdictional defect cannot be cured by waiver. McClaughry v. Deming, 186 U.S. 49, 66, 22 S.Ct. 786, 46 L.Ed. 1049 (1902).

For full understanding the accomplice rule should be considered in context and for this reason we attach the whole of Section 153a of the Manual to this opinion as Exhibit A.

The plaintiff applied to the Air Force Board For Correction of Military Records, after the completion of standard military review procedures. The Board considered evidence against the plaintiff which the Court Martial had excluded as illegally acquired, namely plaintiff's ration card exhibiting irregular punches which may or may not have been overpunches. On the other hand, it also received various affidavits on behalf of plaintiff which purported to amplify, vary, or explain the evidence at the trial, along the lines of plaintiff's contentions. The decision of the Board was adverse to the plaintiff, but it did not make part of the record any indication of how it evaluated the original or new evidence, or what its reasons were. In the circumstances, we cannot give the Board decision weight against the plaintiff here, or accept it as the previously unprovided appellate review. Plaintiff in argument called attention to the cases in which we have overturned Board decisions which we have found arbitrary, capricious, or not supported by substantial evidence. The argument seemed to be, along the lines of Ashe v. McNamara, 355 F.2d 277 (1st Cir., 1965), that this judicial power in some manner overrides the finality language of the Uniform Code of Military Justice, 10 U.S.C. § 876. We consider later what effect this finality language has on the scope of our review of the Court Martial itself. Suffice it to say at this point we do not think the finality, whatever it is, is either enhanced or diminished by the Board proceedings. The case stands before us exactly as if plaintiff had never gone to the Board. It is not arbitrary and capricious, in the absence of unusual circumstances not here present, to consider *ex parte* affidavits of less weight than testimony taken subject to cross-examination.

We have now determined that Section 153a of the Manual For Courts Martial, 1951, provides that no person may be convicted on the uncorroborated testimony of an accomplice if such testimony is self-contradictory. We have further established that the plaintiff Juhl was convicted on the uncorroborated testimony of a purported accomplice. We have further established that the testimony of the purported accomplice was self-contradictory. We have noted that counsel did not request and the Law Officer did not give instruction on this accomplice rule. What remains to be determined is what effect we can give to the foregoing in view of the provision in 10 U.S.C. § 876, that the determination of courts martial under the Code of Military Justice shall be final and not subject to question in any court except the courts set up by the Code itself.

Our recent decision in Augenblick v. United States, 377 F.2d 586, 180 Ct.Cl. —— (1967), takes us part of the way by demonstrating that the Congress clearly indicated in the legislative history that it did not intend to reduce or enlarge the traditional limited collateral attack on courts martial in habeas corpus proceedings, and further, inasmuch as back pay suits in this court had enjoyed equality with habeas corpus as a means of collateral attack almost ever since the first existence of this court, the Congress could not have intended, the legislation not mentioning either, to abolish one and not the other. The reference to habeas corpus in the legislative history must have been demonstrative and not exclusionary. There is, of course, nothing unheard of in statutory finality language not having in court proceedings its exact literal effect. Ashe v. McNamara, supra, 355 F.2d at 281, and cases cited. Therefore, we reiterate that whatever scope of review would be proper, in view of the finality language, in a habeas corpus proceeding, is equally appropriate in a suit in this court for back pay.

The Manual for Courts Martial is not an ordinary handbook. The Uniform Code of Military Justice, supra, Article 36, supra, reads in part as follows:

The procedure, including modes of proof, in cases before courts-martial,

\* \* \* may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, \* \* \*

All regulations under this authority were to be reported to Congress. President Truman by Executive Order 10214, 3 CFR, 1949–1953 Comp., p. 408, invoking this authority, promulgated and prescribed the Manual referred to. There can be no doubt he had in mind that failure to comply with regulations might render a proceeding invalid because there is a clause in the order which reads as follows:

\* \* \* Provided, That nothing contained in this manual shall be construed to invalidate any investigation, trial in which arraignment has been had, or other action begun prior to May 31, 1951; \* \* \*

The Congress had in mind that failure to comply with some other provisions of the Uniform Code would or might be a basis of collateral attack, for it expressly declared that failure to follow Article 32 (Investigation), 10 U.S.C. § 832, "does not constitute jurisdictional error." 10 U.S.C. § 832(d).

■ The manual is a lengthy and formidable document and it would boggle the imagination to suppose that a court martial should be totally invalid for failure to comply with any part of any provision. However, few provisions contain language as strong as the accomplice provision here under consideration. That is, few provisions say as this one does that "a conviction cannot be based" on procedure not in compliance with the rule stated. This appears to indicate plainly that power to convict in violation of this rule is not granted. It is not a mere rule of evidence or procedure.

■ Duly authorized regulations for the conduct of court martials have the force of law. Ex parte Reed, 100 U.S. 13, 22, 25 L.Ed. 538 (1879). Counsel referred to the accomplice rule as a "statute" in oral argument and the deviation from strict accuracy was immaterial.

Collateral attacks in civilian courts upon court martials have been common for over 100 years in our jurisprudence, and it is important now to consider the effect in such a collateral attack of a violation by a court martial of a statute fashioned to govern its procedure.

It is a commonplace that the historic attitude of United States civilian courts was that they could not review court martial proceedings for legal error, but only for lack of jurisdiction. Carter v. Roberts, 177 U.S. 496, 498, 20 S.Ct. 713, 44 L.Ed. 861 (1900); Swaim v. United States, 165 U.S. 553, 561, 17 S.Ct. 448, 41 L.Ed. 823 (1897); Collins v. McDonald, 258 U.S. 416, 418, 42 S.Ct. 326, 66 L.Ed. 692 (1922); Carter v. McClaughry, 183 U.S. 365, 381, 22 S.Ct. 181, 46 L.Ed. 236 (1902); In re Grimley, 137 U.S. 147, 150, 11 S.Ct. 54, 34 L.Ed. 636 (1890); Hiatt v. Brown, 339 U.S. 103, 111, 70 S.Ct. 495, 94 L.Ed. 691 (1950); United States v. Fletcher, 148 U.S. 84, 92, 13 S. Ct. 552, 37 L.Ed. 378 (1893). In Collins v. McDonald, supra, 258 U.S. at 420–421, 42 S.Ct. 326, it was held that the admission, by a court martial, of a confession obtained by duress, was a mere error in admission of testimony which could not be reviewed on habeas corpus, when the accused made no reference to the record to support the assertion of duress. Hiatt v. Brown, is a particularly interesting illustration of the general rule and had the concurrence of all the justices who participated, an unusual circumstance in Supreme Court cases dealing with courts martial at that period. The Fifth Circuit below, 175 F.2d 273 (1949), had held that the conviction was unconstitutional as contrary to due process because of a group of errors which the court basketed to add up to a constitutional deprivation. The errors were as follows:

"(1) Accused was convicted on the theory that although he was on duty as a sentry at the time of the offense, it was incumbent upon him to retreat from his post of duty.

"(2) Accused has been convicted of murder on evidence that does not measure to malice, premeditation, or deliberation.

"(3) The record reveals that the law member appointed was grossly incompetent.

"(4) There was no pre-trial investigation whatever upon the charge of murder.

"(5) The record shows that counsel appointed to defend the accused was incompetent, gave no preparation to the case, and submitted only a token defense.

"(6) The appellate reviews by the Army reviewing authorities reveal a total misconception of the applicable law." 175 F.2d at 277.

The Supreme Court said at 339 U.S. p. 111, 70 S.Ct. at p. 498:

It is well settled that "by *habeas corpus* the civil courts exercise no supervisory or correcting power over the proceedings. * * *. The single inquiry, the test, is jurisdiction." * * *. In this case the court-martial had jurisdiction of the person accused and the offense charged, and acted within its lawful *powers*. The correction of any errors it may have committed is for the military authorities which are alone authorized to review its decision. * * *. (Emphasis supplied.)

In the instant case, the mandatory corroboration requirement of § 153a, of the Manual, clearly shows Congress' intention to withhold from a court-martial the *power* to convict where that standard has not been met. The standard not having been satisfied here, the court-martial lacked the power necessary to convict the plaintiff.

There exists an ancient and respectable doctrine that a court-martial will lose its jurisdiction by failure to follow applicable statutory procedure. In Dynes v. Hoover, 20 How. (61 U.S.) 65, 81, 15 L.Ed. 838 (1857), the Court said:

* * * When [the court martial sentence is] confirmed, it is altogether beyond the jurisdiction or inquiry of any civil tribunal whatever, unless it shall be in a case in which the court had not jurisdiction over the *subject-matter or charge*, or one in which, having jurisdiction over the subject-matter, it has failed to observe the rules prescribed by the statute for its exercise. * * *

The Court had previously indicated, at p. 80, that the court martial is a kind of inferior court and where it "has jurisdiction over the subject-matter, *but is bound to adopt certain rules in its proceedings from which it deviates, whereby the proceedings are rendered coram non judice,"* a proper method of collateral attack was a personal action against the officer who executed the process of the tribunal.

In Runkle v. United States, 122 U.S. 543, 556, 7 S.Ct. 1141, 1146, 30 L.Ed. 1167 (1887), the Court said:

To give effect to its [a court martial's] sentences, it must appear affirmatively and unequivocally that the court was legally constituted; that it had jurisdiction; that all the statutory regulations governing its proceedings had been complied with, and that its sentence was conformable to law.

In McClaughry v. Deming, supra, 186 U.S. at p. 63, 22 S.Ct. at p. 791, the Court said:

"A court-martial organized under the laws of the United States is a court of special and limited jurisdiction. It is called into existence for a special purpose and to perform a particular duty. When the object of its creation has been accomplished, it is dissolved. 3 Greenl.Ev. § 470; Brooks v. Adams, 11 Pick. 441, 442; Mills v. Martin, 19 Johns. 7, 30; Duffield v. Smith, 3 Serg. & R. 590, 599. Such, also, is the effect of the decision of this court in Wise v. Withers, 3 Cranch. 331, 2 L.Ed. 457, which, according to the interpretation given it by Chief Justice Marshall in Ex parte Watkins, 3 Pet. 193, 209, 7 L.Ed. 650, 655, ranked a court-martial as 'one of those inferior courts of limited jurisdiction whose judgments may be questioned collaterally.' To give effect to

its sentences it must appear affirmatively and unequivocally that the court was legally constituted; that it had jurisdiction; that all the statutory regulations governing its proceedings had been complied with, and that its sentence was conformable to law. Dynes v. Hoover, 20 How. 65, 80, 15 L.Ed. 838, 844; Mills v. Martin, 19 Johns. 33. There are no presumptions in its favor, so far as these matters are concerned. * * *."

It is true that among these early cases, instances are not often found of successful collateral attack by reason of violation of applicable statutory regulations. However, in Smith v. United States, 38 Ct.Cl. 257 (1903), we held, citing Runkle v. United States, supra, in a back pay suit that the court martial was void because, contrary to a statutory requirement, the accused had not been served with a copy of the charges and specifications upon his first arrest. The Supreme Court reversed at 197 U.S. 386, 25 S.Ct. 489, 49 L.Ed. 801 (1905), but upon the ground that we misconstrued the statute. It expressly passed over the jurisdiction issue. It would seem the case stands as a valid precedent in this court on the jurisdictional question, the reversal having been on other grounds. In Mullan v. United States, 42 Ct.Cl. 157, at p. 177 (1907), aff'd. 212 U.S. 516, 29 S.Ct. 330, 53 L.Ed. 632 (1909), we said (concerning a statute requiring court-martials to confront the accused with the witnesses against him, which right he had waived):

> The statute in question is not in any manner a limitation upon the jurisdiction of the court-martial. The authority of the tribunal is not prescribed by its terms. It is merely a legal regulation as to its proceedings securing certain rights to the accused, which in the absence of an express waiver upon his part, must be accorded him by the tribunal or *subject their findings or sentence to collateral attack in civil courts,* and as such we have treated it. * * * (Emphasis supplied).

In Humphrey v. Smith, 336 U.S. 695, 69 S.Ct. 830, 93 L.Ed. 986 (1949), the Court held that failure to conduct a proper pre-trial preliminary investigation did not go to the jurisdiction when the trial itself was fair. Three judges dissented and would have held that the omission of a proper statutory preliminary investigation was jurisdictional. It would appear a reasonable inference from the conclusion of the majority that they would have seen the defective procedure as jurisdictional if they had thought it tainted the fairness of the trial itself. Article 32 of the Uniform Code, 10 U.S.C. § 832, now expressly declares that this kind of error shall not be jurisdictional.

From the cases up to that point the Congress and the President might well have been on notice that any regulations issued under Article 36, supra, might be held to prescribe procedure which or some of which would have to be complied with for the court martial to stand up against collateral attack. The paucity of instances under previous law of successful attack on the ground of failure to comply with a statute or a Presidential regulation might have been deemed attributable to the fact that such statutory procedures were few and simple and were not burdensome to comply with.

The challenge of a court martial for failure to follow a statute fashioned to govern it thus would seem to have better historic foundation than its challenge on merely constitutional grounds. Only in 1947 had come Shapiro v. United States, 69 F.Supp. 205, 107 Ct.Cl. 650, which seems to have been somewhat of an innovation as the first successful collateral attack on a court martial for breach of the Bill of Rights. In Burns v. Wilson, supra, Mr. Justice Frankfurter refers to the case in a separate comment at pp. 844 and 847 of the same volume, 74 S.Ct. 3, 98 L.Ed. 363 and laments that it was not called to the Supreme Court's attention by the parties in their briefs. The Justices in the latter case went off in different directions and no opinion commanded the support of a majority. Mr. Justice Minton invoked the old rule limiting collateral attack to jurisdiction-

al issues, citing In re Grimley, supra, and Hiatt v. Brown, supra, but failed to note how *Grimley* was, among the older cases, representative of one side of the range and not the median. The opinion of the Court, so called, per Mr. Chief Justice Vinson, sustaining the court martial, pronounced doctrines which in a way may be considered to have started a new line of jurisprudence. They point out the separate nature of military law, the need of the military for strict discipline, and the fact that civilian courts lacked supervisory powers in the field. They expressed the view that the habeas corpus jurisdiction was less than that over civilian courts. They looked hopefully at the prospects of the new Uniform Code of Military Justice. They pointed out the finality provision in the Code, but expressed the opinion that it did not relieve the civilian courts of the duty to take corrective action in cases of fundamental unfairness and violations of the constitution. However, the civilian courts should not reweigh issues which military courts have dealt with fairly and fully.

Mr. Justice Frankfurter thought the case should be reargued. Mr. Justice Jackson concurred in the result and two Justices dissented.

■ Succeeding decisions in this court, Shaw v. United States, 357 F.2d 949, 174 Ct.Cl. 899 (1966), and *Augenblick*, supra, have developed the themes of constitutional deprivation and fundamental unfairness. Nothing in these cases should be taken as authority that a constitutional deprivation has to be found to maintain a collateral attack, when such an attack would have been maintainable without constitutional grounds before 1950. *Augenblick*, involved a violation of the Jencks Act which is of general application. There may be a valid distinction between statutes of general application and those

fashioned directly for courts martial. At any rate, we found a constitutional issue in *Augenblick,* so we placed the case in the mainstream of these recent decisions.

■ Express statutory provisions to assure fairness in court martials were long the only "bill of rights" an accused soldier could rely on. Only later, much later, did it become possible to him to invoke the constitutional Bill of Rights on matters wherein the statutes were silent. It is entirely logical and consistent therefore, when the text and context of the statute permits, that in a collateral attack breach of such an express statutory provision has the same legal consequence as breach of the constitutional bill of rights does when the statute is silent.

■ The Manual's accomplice rule, which we apply here, goes to the basic fairness of the trial in that it deals with the existence of any probative evidence sustaining the conviction. To assure that convictions stand upon truly probative evidence, the President has directed that "a conviction cannot be based" on a record failing to meet the accomplice rule. In its relation to fundamental fairness, this rule is similar, and serves a parallel purpose, to the constitutional rule that the due process clause invalidates a conviction rested on no evidence at all. Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); Shuttlesworth v. City of Birmingham, 382 U.S. 87, 86 S. Ct. 211, 15 L.Ed.2d 176 (1965).

Since his conviction was thus invalid, plaintiff is entitled to recover back pay and allowances, less appropriate offsets, from the date on which the pay and allowances were withheld to the date of judgment. Judgment is entered for plaintiff to that effect. The amount of recovery will be determined under Rule 47(c).