UNITED STATES *v.* AUGENBLICK ET AL.

No. 45. Argued November 21, 1968.—Decided January 14, 1969.

*Assistant Attorney General Weisl* argued the cause for the United States. With him on the briefs were *Solicitor General Griswold, John C. Eldridge,* and *Robert V. Zener.*

*Joseph H. Sharlitt* argued the cause for respondent Augenblick. With him on the brief was *Steven R. Rivkin. Francis J. Steiner, Jr.,* argued the cause and filed a brief for respondent Juhl.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondents, who had been convicted by courts-martial, brought these suits for back pay. Augenblick, though charged with sodomy, was convicted of a lesser offense, an indecent act, and Juhl was convicted of selling overseas merchandise of an Air Force Exchange. Augenblick was sentenced to dismissal from the service; Juhl was sentenced to reduction in rank, partial forfeiture of pay, and confinement for six months. Each exhausted

the remedies available to him [1] and, not having obtained relief, brought suit in the Court of Claims to recover back pay,[2] on the ground that the court-martial infringed on his constitutional rights. The Court of Claims undertook to review the judgments of the courts-martial for constitutional defects and rendered judgments for respondents. 180 Ct. Cl. 131, 377 F. 2d 586; 181 Ct. Cl. 210, 383 F. 2d 1009. The case is here on petition for writs of certiorari which we granted because of the importance of the question concerning the jurisdiction of the Court of Claims to review judgments of courts-martial. 390 U. S. 1038.

Article 76 of the Uniform Code of Military Justice, 10 U. S. C. § 876, provides that military review of court-martial convictions shall be "final and conclusive" and "binding upon all . . . courts . . . of the United States." The legislative history of the provision makes clear that

---

[1] Augenblick's conviction was reviewed by a Navy Board of Review and affirmed, one member dissenting. The Court of Military Appeals denied a petition for review without opinion January 11, 1963. The Secretary of the Navy declined review on January 30, 1963. See 10 U. S. C. § 871.

Augenblick was dismissed February 5, 1963. On November 14, 1964, the Board for Correction of Records denied relief.

His suit in the Court of Claims was filed October 22, 1964.

Juhl's conviction was reviewed by the Staff Judge Advocate. The Air Force Board for Correction of Military Records also denied relief. His suit in the Court of Claims was filed October 12, 1965.

[2] Back-pay suits are brought under 28 U. S. C. § 1491 which provides that the Court of Claims has jurisdiction to render judgment against the United States on any claim "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." See *Eastport Steamship Corp.* v. *United States*, 178 Ct. Cl. 599, 606, 372 F. 2d 1002, 1008. See Brenner, Judicial Review by Money Judgment in the Court of Claims, 21 Fed. B. J. 179, 190–191 (1961).

relief by way of habeas corpus [3] was an implied exception to that finality clause (S. Rep. No. 486, 81st Cong., 1st Sess., 32; H. R. Rep. No. 491, 81st Cong., 1st Sess., 35)—an exception not available to respondent Augenblick because he was discharged from the service, not imprisoned, and a remedy apparently not invoked by respondent Juhl during his short period of detention.

An additional remedy, apparently now available but not clearly known at the time of these court-martial convictions, is review by the Court of Military Appeals. In *United States* v. *Bevilacqua,* 18 U. S. C. M. A. 10, 11–12, 39 C. M. R. 10, 11–12, decided November 8, 1968, that court held that it has jurisdiction "to accord relief to an accused who has palpably been denied constitutional rights in any court-martial; and that an accused who has been deprived of his rights need not go outside the military justice system to find relief in the civilian courts of the Federal judiciary." [4]

Prior to the enactment of Article 76, the Court of Claims had entertained suits for back pay brought by servicemen who had been convicted by courts-martial. See, *e. g., Keyes* v. *United States,* 109 U. S. 336; *Runkle* v. *United States,* 122 U. S. 543; *Swaim* v. *United States,* 165 U. S. 553; *United States* v. *Brown,* 206 U. S. 240. These decisions, it is argued, were based on the theory that the Court of Claims had jurisdiction over back-pay suits where the courts-martial lacked "jurisdiction" in the traditional sense, *viz.,* where "there is no law author-

[3] Habeas corpus has been the conventional way of obtaining here collateral review of conviction by military tribunals. See *Reid* v. *Covert,* 354 U. S. 1; *Burns* v. *Wilson,* 346 U. S. 137; *Whelchel* v. *McDonald,* 340 U. S. 122; *Gusik* v. *Schilder,* 340 U. S. 128.

[4] As we have noted, n. 1, *supra,* Augenblick sought and was denied review by the Court of Military Appeals; and Juhl in his petition to the Court of Claims alleged that "[n]o appeal was possible under law to the United States Court of Military Appeals," an allegation admitted by the Government in its answer.

izing the court-martial, or where the statutory conditions as to the constitution or jurisdiction of the court are not observed." *Keyes* v. *United States, supra,* at 340. From this premise it is urged that when, in review of state convictions by way of federal habeas corpus, the concept of "jurisdiction" was broadened to include deprivation by the trial tribunal of the constitutional rights of a defendant (*Moore* v. *Dempsey,* 261 U. S. 86; *Johnson* v. *Zerbst,* 304 U. S. 458), the scope of collateral review of court-martial convictions was also broadened. That is the position of the Court of Claims which rejected the view that the adoption of Article 76 introduced a new regime and that 10 U. S. C. § 1552 which provides a remedy to correct a military record in order to "remove an injustice,"[5] see *Ashe* v. *McNamara,* 355 F. 2d 277, is, apart from habeas corpus, the exclusive remedy.[6]

On that issue there have been a variety of views expressed in this Court. See *Burns* v. *Wilson,* 346 U. S. 137, 149, 152–153. There is likewise unresolved the question whether, if the view of the Court of Claims is correct, the District Courts might have a like jurisdiction over suits not exceeding $10,000 under the Tucker Act, 28 U. S. C. § 1346 (a)(2).[7] After hearing argument and studying the record of these cases we do not reach those questions. For we conclude that, even if we assume, *arguendo,* that a collateral attack on a court-martial judgment may be made in the Court of Claims

---

[5] Section 1552 (a) of 10 U. S. C. provides in part:

"The Secretary of a military department, under procedures established by him and approved by the Secretary of Defense, and acting through boards of civilians of the executive part of that military department, may correct any military record of that department when he considers it necessary to correct an error or remove an injustice."

[6] 180 Ct. Cl., at 140–143, 377 F. 2d, at 591–593.

[7] For a discussion of Tucker Act jurisdiction over back-pay suits see H. R. Rep. No. 1604, 88th Cong., 2d Sess., 2.

through a back-pay suit alleging a "constitutional" defect in the military decision, these present cases on their facts do not rise to that level.

The Court of Claims gave relief to Juhl because of the provision in paragraph 153 (a) of the Manual for Courts-Martial which states that the court-martial "cannot" base a conviction "upon the uncorroborated testimony of a purported accomplice in any case, if such testimony is self-contradictory, uncertain, or improbable."

We do not stop to review the evidence which bears on this issue and which the Court of Claims sets forth in detail. See 181 Ct. Cl., at 215–225, 383 F. 2d, at 1012–1017.

The Manual was prescribed by the President pursuant to Article 36 of the Uniform Code, 10 U. S. C. § 836. It is a guidebook that summarizes the rules of evidence applied by court-martial review boards. See *Levy* v. *Resor,* 17 U. S. C. M. A. 135, 37 C. M. R. 399. The paragraph regarding accomplice testimony is a statutory rule of evidence. Such rules do not customarily involve constitutional questions. See *Humphrey* v. *Smith,* 336 U. S. 695; *Whelchel* v. *McDonald,* 340 U. S. 122. The *Whelchel* case involved various paragraphs of the Manual dealing with the defense of insanity. We did not sanction review of those paragraphs in a collateral remedy but held that only a denial of the opportunity for the military to consider the defense of insanity "goes to the question of jurisdiction"; and we added that, "[a]ny error that may be committed in evaluating the evidence tendered is beyond the reach of review by the civil courts." 340 U. S., at 124.

Rules of evidence are designed in the interest of fair trials. But unfairness in result is no sure measure of unconstitutionality. When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions.

Of course, if knowing use of its perjured character were linked with *any* testimony (*Mooney* v. *Holohan,* 294 U. S. 103; *Brady* v. *Maryland,* 373 U. S. 83), we would have a problem of different dimensions. But nothing of the kind is involved here.

Augenblick's claim of constitutional defect in his court-martial concerns a phase in the discovery of evidence. He and a young airman, Hodges, were apprehended late at night in a parked car. The civilian police who arrested them turned them over to the Armed Forces Police who questioned them separately at a naval station in Washington, D. C. Hodges was then taken to an Air Force base in Maryland where he swore to a five-page written statement.

Augenblick was questioned at the naval station after Hodges. During this questioning of both men, Agent James made a tape recording of the conversations. Agent Mendelson either took some notes or wrote up some notes later.

Hodges apparently started out by denying that anything happened in the parked car and later maintained that sodomy had taken place, though, as we have said, Augenblick's conviction was for an indecent act, not for sodomy. Hodges later received an honorable discharge; and it was the theory of the defense that he may have been induced to change his testimony on a promise that one would be given. It is indeed heavily impressed on us that Hodges was kept available for some months and left in good standing, in spite of his reprehensible conduct, and given an honorable discharge only after Augenblick was convicted.

The defense moved for the production of the notes which Mendelson had taken—or later typed up—and of the tape which James had made. As to the notes, the law officer, without examining them *in camera* or otherwise, denied the request. As to the tapes, the law

officer ordered that they be produced or that the Government produce witnesses at an out-of-court hearing who could explain their nonexistence. The tapes were not produced; but each agent who had had contact with the recording was called, except Mendelson who was in Norfolk. James testified that there was a tape but no one knew where it was or what had happened to it. The defense urged that Mendelson, to whom the tapes had apparently once been delivered, be called; but the law officer after reading the record of Mendelson's testimony on the tape recording at a pretrial investigation, refused.

The question of the production of Mendelson's "notes" as well as the question of the production of the tapes bring into focus the Jencks Act, 18 U. S. C. § 3500. This Act, enacted after our decision in *Jencks* v. *United States,* 353 U. S. 657, provides that when a witness testifies for the United States the Government may be required to produce "any statement" of the witness which relates to his testimony. § 3500 (b). The term "statement" is defined in subsection (e) as:

> "(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or
>
> "(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

There is considerable doubt if Mendelson's "notes" fall within the definition of subsection (e). He testified at the court of inquiry that he made "rough pencil notes"; and he said at the pretrial investigation, "I did jot down a couple of rough notes." Both the law officer and the Board of Review concluded that these "notes" were not a

"substantially verbatim" statement producible under the Jencks Act.

It is difficult to tell from this record the precise nature of Mendelson's "notes," whether they recorded part of Hodges' interview or whether they were merely a memorandum giving names, places, and hours. Certainly they were not a statement covering the entire interview; and if they were a truncated version, they would pose the question reserved in *Palermo* v. *United States,* 360 U. S. 343. Since on examination of the record we are left in doubt as to the precise nature of the "notes," we cannot say that the command of the Jencks Act was disobeyed when they were not ordered to be produced.

Moreover, we said in *Palermo* v. *United States, supra,* at 353, that the administration of the Jencks Act must be entrusted to the "good sense and experience" of the trial judges subject to "appropriately limited review of appellate courts." We cannot conclude that when it came to the "rough notes" of Mendelson, the law officer and Board of Review abused their discretion in holding that they need not be produced under the Jencks Act.

The same is true of the rulings concerning production of the tapes. There is no doubt but that the tapes were covered by the Jencks Act; and an earnest effort was made to locate them. Their nature and existence were the subject of detailed interrogation at the pretrial hearing convened at the request of the defense. Four government agents testified concerning the interrogation of Hodges, the recording facilities used, the Navy's routine in handling and using such recordings, and the fate of the tape containing Hodges' testimony. The ground was covered once again at the court-martial. The tapes were not produced; the record indeed shows that they were not found; and their ultimate fate remains a mystery. The law officer properly ruled that the Government bore

the burden of producing them or explaining why it could not do so.

The record is devoid of credible evidence that they were suppressed. Whether Mendelson should have been recalled is a matter of debate and perhaps doubt. But questions of that character do not rise to a constitutional level. Indeed our *Jencks* decision and the Jencks Act were not cast in constitutional terms. *Palermo* v. *United States, supra,* at 345, 362. They state rules of evidence governing trials before federal tribunals; and we have never extended their principles to state criminal trials. It may be that in some situations, denial of production of a Jencks Act type of a statement might be a denial of a Sixth Amendment right. There is, for example, the command of the Sixth Amendment that criminal defendants have compulsory process to obtain witnesses for their defense. *Palermo* v. *United States, supra,* at 362 (BRENNAN, J., concurring in result). But certain it is that this case is not a worthy candidate for consideration at the constitutional level.

The Court of Claims, in a conscientious effort to undo an injustice, elevated to a constitutional level what it deemed to be an infraction of the Jencks Act and made a denial of discovery which "seriously impeded his right to a fair trial" a violation "of the Due Process Clause of the Constitution." 180 Ct. Cl., at 166, 377 F. 2d, at 606–607. But apart from trials conducted in violation of express constitutional mandates, a constitutionally unfair trial takes place only where the barriers and safeguards are so relaxed or forgotten, as in *Moore* v. *Dempsey, supra,* that the proceeding is more a spectacle (*Rideau* v. *Louisiana,* 373 U. S. 723, 726) or trial by ordeal (*Brown* v. *Mississippi,* 297 U. S. 278, 285) than a disciplined contest.

*Reversed.*