Peter **CRAYCROFT**, Appellant,

v.

William E. **FERRALL**, Commandant, Thirteenth Naval District, Robert Strange McNamara, as Secretary of Defense, and Robert H. V. Baldwin, as Acting Secretary of the Navy, or his Successor as Acting Secretary, or as Secretary of the Navy, Appellees.

Peter **CRAYCROFT**, Appellant,

v.

Clark **CLIFFORD**, Secretary of Defense, Paul Robert Ignatius, Secretary of the Navy, and H. J. Trum, Commandant, Thirteenth Naval District, Appellees.

Nos. 22582, 22895.

United States Court of Appeals Ninth Circuit.

March 5, 1969.

John Caughlan (argued), Seattle, Wash., for appellant.

Michael J. Swofford (argued), Asst. U. S. Atty., Eugene G. Cushing, U. S. Atty., Michael Hoff, Asst. U. S. Atty., Seattle, Wash., for appellees.

Before CHAMBERS, HAMLIN and ELY, Circuit Judges.

ELY, Circuit Judge:

Appellant Craycroft appeals from District Court dismissals of his two successive complaints challenging his detention in the United States Navy following the Navy's denials of his applications for discharge from the service as a conscientious objector. Craycroft sought habeas corpus relief under 28 U.S.C. §§ 2241–2244. He also asked for a declaration under 28 U.S.C. § 2201 that he was a conscientious objector and sought mandatory relief to enjoin court-martial proceedings and to compel the Navy to comply with its own regulations which, allegedly, would require that he be discharged. The complaint also asserted jurisdiction under 28 U.S.C. § 1331 by charging that Craycroft had been denied due process of law in the Navy's consideration of his application. The District Court found that it lacked jurisdiction over the matter and dismissed Craycroft's first complaint on August 30, 1967. On May 3, 1968, the District Court dismissed Craycroft's second petition for habeas corpus relief in light of the similarity of issues to the first action which was pending our appellate decision. Craycroft brought his second appeal to us under 28 U.S.C. § 2253. We have consolidated the two appeals.

The District Court's initial dismissal of Craycroft's complaint was predicated on a finding that Craycroft had not exhausted the opportunities to present his complaints in an appropriate military judicial proceeding. We need not determine whether it was necessary, as the Government contends, for Craycroft to undergo a court-martial and exhaust all available appeals and military remedies therefrom, since it clearly appears that Craycroft has not exhausted all military *administrative* remedies that are presently available to him.[1]

On May 26, 1966, Craycroft enlisted in the Navy by taking an oath and signing a contract obliging himself to six years' service unless sooner discharged. On June 16, 1966, he voluntarily entered the Reserve Officer Corps program. He completed eight weeks' training at the Officer Candidate Training School, Newport, Rhode Island, and was assigned to the Naval Reserve Center, Eugene, Oregon. In November, 1966, Craycroft signed a statement of his understanding that he was scheduled to commence two years' active duty in December, 1967. In the District Court, he nevertheless alleged that he shortly thereafter, following the death of his father, became a conscientious objector. On February 17, 1967, he requested, by letter to the commanding officer of the Naval Reserve Center, Eugene, Oregon, Commander L. M. Madden, that he be permitted to resign from the officer program. He indicated that he had always been opposed to war and violence and had from the beginning entertained strong reservations about entering the Naval Reserve Officer program. On February 21st, Commander Madden interviewed Craycroft and then forwarded Craycroft's letter to higher authorities, together with recommendations that Craycroft's Reserve Officer Candidate status be withdrawn and that he be ordered to active duty or

---

1. We distinguish our analysis of the exhaustion problem from cases in which, once military administrative remedies have been exhausted, in-service conscientious objectors were allowed to seek civil relief before enduring court-martial proceedings and exhausting possible appeals therefrom. *See* Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968); Gann v. Wilson, 289 F.Supp. 191 (N.D.Cal.

1968); Crane v. Hedrick, 284 F.Supp. 250 (N.D.Cal.1968). *But see* Noyd v. McNamara, 267 F.Supp. 701 (D.Colo.), affirmed, 378 F.2d 538 (10th Cir.), cert. denied, 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967). We need not reach the Government's contention in this case that military judicial remedies must be exhausted.

studied for possible conscientious objector status. Craycroft was disenrolled from the officer program on March 13, 1967, for failure to maintain the required standard of professional attitude and for failure to maintain satisfactory drill attendance.

The Navy returned to Craycroft application forms required by Bureau of Personnel Manual (BUPERSMAN) Art. C–5210 for consideration for conscientious objector discharge under Department of Defense Directive (DD) 1300.6 (Aug. 21, 1962). This Directive provided, in Part III, the following explanation:

"No vested right exists for any individual to be discharged from military service at his own request before the expiration of his term of service, whether he is serving voluntarily or involuntarily. * * *

"The fact of conscientious objection does not exempt men from the draft; however, the Congress has deemed it more essential to respect a man's religious beliefs than to force him to serve in the Armed Forces * * *. Consistent with this national policy, bona fide conscientious objection by persons who are members of the Armed Forces will be recognized to the extent practicable and equitable.

" * * * request for discharge after entering military service, based solely on conscientious objection which existed but was not claimed prior to induction or enlistment, cannot be entertained."

Craycroft returned the submitted forms on April 5, 1967, and in them explained his beliefs and submitted other required information. For supplement to the application, BUPERSMAN Art. C–5210 (2) (b) added the following requirement:

"The commanding officer and a chaplain, if available, shall interview the member, review the information contained in his request, and insure that all information required * * * has been included. A statement from the chaplain shall be included giving comments on the sincerity of the applicant in his belief and an opinion as to the source of the belief, i. e., whether or not it is based on belief in a Divine Being. * * * The commanding officer's endorsement shall in all cases express his opinion as to the sincerity of the man. * * * If a chaplain is not reasonably available because of essential operations or the remoteness of the applicant's unit, a statement will be included to this effect."

Craycroft complains that no chaplain's statement was included in his first application and that the endorsement was supplied not by his commanding officer, but by Commander Madden, who allegedly was convinced that Craycroft insincerely presented his claimed beliefs. Commander Madden explained in the endorsement:

"In order that the reviewing authority may have as many facts as possible in the final determination of this case, my relationship to this man is hereby stated. I am not his commanding officer as such. However, I am the only active duty officer here at the Training Center. In this capacity CRAYCROFT was interviewed by me in MAY of 1965, as a prospective Officer Candidate. His Commanding Officer * * * is an inactive reserve officer and has had very little personal contact with subject man. In this light I have taken the prerogative of writing this endorsement as it is believed that my knowledge of the case transcends that of [his commanding officer]. * * * CRAYCROFT'S Commanding Officer * * * was contacted. This endorsement was read to him over the phone and he interposed no objection to it in any respect."

On April 11, 1967, Commander Madden forwarded Craycroft's request for discharge through the proper channels to the Chief of Naval Personnel, Washington, D. C. It was provided in DD 1300.6, III(E) (Aug. 21, 1962), that claims of conscientious objection should be judged by the same standards used by the Selective Service, and, accordingly, Cray-

croft's application was referred, under the procedure outlined in BUPERSMAN Art. C–5210(2) (c), to the Director of the Selective Service System, General Hershey, for an advisory opinion on the validity of the conscientious objector claim. On June 1, 1967, General Hershey issued his advisory opinion that if Craycroft were being considered for induction at that time he would not receive a classification as a conscientious objector. After receiving additional materials concerning Craycroft's case, General Hershey reaffirmed his opinion on June 14, 1967. Craycroft filed a second application for discharge on June 26, 1967. Both applications were reviewed, according to Department of Defense procedures, by a Board of Officers and Enlisted Personnel. On July 21, 1967, The Chief of Naval Personnel reaffirmed his recommendation concerning the first application, which was that Craycroft's request be denied.

Although no formal hearing was given Craycroft beyond his interview with Commander Madden, Naval authorities evaluated the applications for discharge on the basis of the documentary evidence supplied by Craycroft, including his own statements and letters from his friends and relatives. Two letters from clergymen were also submitted on Craycroft's behalf. The Chief of Naval Personnel noted that Craycroft's enlistment and prior inconsistent acts cast doubt on the sincerity of his professed beliefs and that these beliefs appeared to be based on philosophical, rather than religious, concepts. Additionally, his beliefs were determined to amount to no more than an extension of certain attitudes that he already harbored prior to his enlistment. DD 1300.6 precludes the issuance of conscientious objector discharges in such cases. At this point, Craycroft brought his complaints to the District Court. He alleged that the procedures directed by BUPERSMAN Art. C–5210 failed to provide a method whereby his application could receive fair consideration at any level. He also argued that the Navy failed to follow its own procedures in its failure to require endorsements of his application by his commanding officer and a chaplain. Moreover, Craycroft asserted that the Navy's failure to find that he was a conscientious objector constituted error as a matter of law.

The Navy ordered Craycroft to report for active duty on November 1, 1967, following the denial by the District Court of his first attempt at gaining civil relief from the Chief of Naval Personnel's denial of his application for discharge. When Craycroft disobeyed this order he was arrested on November 9th and court-martialed under U.C.M.J. Arts. 86 (unauthorized absence) and 92 (failure to obey orders in writing of which one has knowledge). The Naval board which conducted his court-martial refused to consider evidence that he had been denied due process in the administrative consideration of his application for discharge as a conscientious objector. Craycroft was sentenced to 60 days' confinement and reduction of rank and pay.

During Craycroft's incarceration he submitted, on January 30, 1968, a further request for a conscientious objector's discharge. On this application, all necessary endorsements were clearly supplied. His commanding officer endorsed the application with the opinion that Craycroft's beliefs, although sincere, were grounded more in moral philosophy than in religion. The chaplain's endorsement supported Craycroft's position that his beliefs stemmed from sincere religious conviction. This application was also denied without, Craycroft alleges, "any basis in fact whatsoever." Following the District Court's second denial of civil relief, on May 3, 1968, Craycroft was again court-martialed, convicted, and incarcerated for his repeated refusal to report for active combatant duty.

Many issues remain unresolved concerning the role that civil courts may properly take in aiding military personnel who seek discharges from the service as conscientious objectors. *See* Comment, God, the Army, and Judicial Review: The In-Service Conscientious Objector, 56 Calif.L.Rev. 379 (1968). See

also Noyd v. Bond, 402 F.2d 441 (10th Cir. 1968), cert. granted, 393 U.S. 1048, 89 S.Ct. 692, 21 L.Ed.2d 690 (Jan. 20, 1969); United States ex rel. Mankiewicz v. Ray, 399 F.2d 900 (2d Cir. 1968); Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968); Gann v. Wilson, 289 F.Supp. 191 (N.D.Cal.1968); Crane v. Hedrick, 284 F.Supp. 250 (N.D.Cal.1968); Saunders v. Crouchley, 274 F.Supp. 505 (D. Neb.1967). In this case, we resolve only the three issues that we believe necessary to disposition. We need not reach any of the issues that we left open for future consideration in Minasian v. Engle, 400 F.2d 137, note 1 (9th Cir. 1968), a case which also involved an attempt at habeas corpus relief by an enlisted man seeking a discharge because of conscientious objection.

### 1. *Has Craycroft exhausted his administrative remedies?*

■ Following the denials of Craycroft's conscientious objector claims by the Chief of Naval Personnel, he did not apply to the Board for Correction of Naval Records for correction of an error or for the removal of an injustice. This Board, along with similar Boards for the other military services, is composed of civilian personnel in the executive part of a military department and was established pursuant to section 207 of the Legislative Reorganization Act of 1946, 10 U.S.C. § 1552. Congress intended that these Boards should eliminate the earlier necessity for aggrieved military personnel to seek private legislative bills for relief. Since the remedial purpose of this legislation was to afford the kind of relief that Congress could have afforded directly in an individual case, the power of the Boards has been broadly construed to provide potential relief notwithstanding the "finality" or conclusiveness attributed to the decisions of other military authorities. *See* 41 Op.Att'y Gen. 35

(1954); 41 Op.Att'y Gen. 19 (1952); 41 Op.Att'y Gen. 57 (1951); 41 Op.Att'y Gen. 1 (1949); 40 Op.Att'y Gen. 504 (1947).

Numerous courts, including our own, have held that military administrative action on discharges or retirement orders is not exhausted before one applies to the Board for Correction in his branch of the military service. *See* Nelson v. Miller, 373 F.2d 474 (3d Cir.), cert. denied, 387 U.S. 924, 87 S.Ct. 2042, 18 L. Ed.2d 980 (1967); Sohm v. Fowler, 124 U.S.App.D.C. 382, 365 F.2d 915 (1966); McCurdy v. Zuckert, 359 F.2d 491 (5th Cir.), cert. denied, 385 U.S. 903, 87 S.Ct. 212, 17 L.Ed.2d 133 (1966); Schwartz v. Covington, 341 F.2d 537 (9th Cir. 1965); Ogden v. Zuckert, 111 U.S.App.D.C. 398, 298 F.2d 312 (1961); Reed v. Franke, 297 F.2d 17 (4th Cir. 1961); cf. Mathis v. United States, 391 F.2d 938, 939 n. 1, vacated on other grounds, 394 F.2d 519 (Ct.Cl.1968).[2] There is no indication from the language of the implementing statute, 10 U.S.C. § 1552, that the Board for Correction lacks power to consider the correction of military records of in-service personnel who seek discharges for convenience of the Government under 32 C.F.R. § 730.6 (1968) and BUPERS-MAN Art. C–5210 because of conscientious objection. We think, therefore, that we must treat the Board for Correction of Naval Records as a potentially available source of administrative relief for the determination of whether the military disposition of Craycroft's claims should be adjusted because of error or injustice.

The manner of access to the Board for Correction of Naval Records and its responsibilities are dealt with in 32 C.F.R. § 723 (1968). One may apply to the Board at any time within three years of the time of alleged error or injustice. Craycroft is not now barred by this fixed time limit, and moreover, the Board may excuse the time limit in the interest of

---

2. We note also that the Supreme Court has recently, in listing the available remedies that the Respondents had exhausted, included resort to the Board for Correction of Records. United States v. Augenblick, 393 U.S. 348, 348–49 n. 1, 89 S.Ct. 528, 21 L.Ed.2d 537 (Jan. 14, 1969).

justice.[3] The Board will review each application to determine whether to deny it or authorize a hearing. The Board must grant a hearing, assuming a timely application after exhaustion of other effective administrative remedies, unless it determines that the evidence presented is insufficient to indicate probable error or injustice. 32 C.F.R. § 723.3(e) (1968). At such a hearing, Craycroft would be entitled to representation by his own counsel and to present witnesses.[4] Following a hearing, the Board must prepare a complete record of the proceedings, make written findings and recommendations, and submit them to the Secretary of the Navy for appropriate action.[5] Upon the termination of that procedure, civil courts have relieved persons aggrieved by arbitrary or otherwise illegal action by the Secretary and the Board. *See* Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1955); Ashe v. McNamara, 355 F.2d 277 (1st Cir. 1965).

■ In failing to submit an application to the Board for Correction of Naval Records and to await its action, Craycroft did not exhaust the administrative remedies that were open to him when he sought relief from the District Court. Moreover, new military procedures have been instituted for the processing of in-service conscientious objector claims. Craycroft essentially complains of the lack of fair consideration of his application at the levels of naval authority that he pursued under DD 1300.6 (Aug. 21, 1962) and BUPERSMAN Art. C–5210. These regulations were cancelled seven days after the District Court's dismissal of Craycroft's second complaint and superseded by DD 1300.6 (May 10, 1968). The new procedures provide applicants with the right to a hearing before an officer who is knowledgeable about conscientious objector policies and procedures. The applicant may bring his attorney to the hearing if he desires to do so. The hearing officer will then enter his recommendations and reasons therefor in the applicant's file. The availability of these new, improved procedures persuaded the Second Circuit, confronted with two cases similar in certain respects to Craycroft's, to require the Navy to reprocess old-procedure applications under the new Department of Defense Directive. United States ex rel. Mankiewicz v. Ray, 399 F.2d 900 (2d Cir. 1968); Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968).

In Gusik v. Schilder, 340 U.S. 128, 71 S.Ct. 149, 95 L.Ed. 146 (1950), the petitioner for a writ of habeas corpus, in military custody following a court-martial conviction, had exhausted all remedies available to him at the time when he sought civil relief. The District Court issued the writ after a hearing. A new military remedy subsequently became available when legislation granted discretion to the Judge Advocate General to grant a new trial in any court-martial case. The Supreme Court allowed the District Court to retain jurisdiction to save the petitioner the possible expense of a second successful hearing but directed that the petitioner should exhaust the new military remedies which had become available to him for the first time. We read at 132, 71 S.Ct. at 151:

> "If an available procedure has not been employed to rectify the alleged error which the federal court is asked to correct, any interference by the federal court may be wholly needless. The procedure established to police the errors of the tribunal whose judgment is challenged may be adequate for the occasion. If it is, any friction between the federal court and the military or state tribunal is saved. That policy is as well served whether the remedy which is available was existent at the time resort was had to the federal courts or was subsequently created * * *."

■ We conclude that Craycroft did not exhaust the administrative remedies

---

3. 32 C.F.R. § 723.3(b) (1968).

4. 32 C.F.R. §§ 723.4, .5 (1968).

5. 32 C.F.R. §§ 723.6, .7, .8 (1968).

that were open to him at the time he sought relief in the District Court, and we also conclude that Craycroft must apply for discharge under the new procedures now available before it can be held that he has exhausted his administrative remedies.

## 2. *Should the District Court have required exhaustion of administrative remedies?*

The leading case declaring "the long-settled rule of judicial administration that no one is entitled to relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted" is Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938).[6] Mr. Justice Brandeis, who delivered the Court's opinion in *Myers,* made clear in an earlier case that application of the rule of exhaustion of administrative remedies requires the exercise of judicial discretion and that the task of an appellate court is to determine whether a lower court has abused that discretion. United States v. Abilene & S. Ry. Co., 265 U.S. 274, 282, 44 S.Ct. 565, 68 L.Ed. 1016 (1924).

Like any other rule, the requirement of exhaustion of administrative remedies prevails whenever the purposes for the rule will be served in the context of a particular case. Among these purposes, all of which generally point to the efficient functioning of our federal legal system, are the following: (1) to avoid excessive encroachment by the judiciary into areas designated by the Constitution or Congress to be within the fundamental responsibility of the legislative or executive branches of the federal government; (2) to avoid interference with the orderly functioning of the administrative process; (3) to discourage a party from "shopping" for a favorable forum; (4) to relieve the courts of the necessity of deciding constitutional questions or interpreting statutes in matters of public import when recourse to administrative channels might supply relief or moot the controversy;[7] (5) to require administrative completion of a record involving special areas of administrative expertise or complicated or close issues of fact; (6) to avoid advisory opinions and to conserve judicial energies in cases wherein, if action taken at a lower level of the administrative hierarchy is affirmed, the aggrieved party presumably could yet hope for relief by pursuing his administrative appeals. *Cf.* Sohm v. Fowler, 124 U.S.App.D.C. 382, 365 F.2d 915 (1966).

A major premise supporting the requirement of exhaustion is that recourse to the full administrative process might satisfactorily have resolved the debated issues. Accordingly, it is unlikely that a court would require exhaustion if an administrative body's actions constituted a readily discernible error of a type unlikely to be corrected by further recourse to the administrative process and resulting in great injury to a party or to the public.[8] It is also reasonable that a court should relax the requirement of exhaustion in a case that can be decided only by the determination of an issue not addressed to an area of administrative judgment.[9] Furthermore, the Supreme

---

6. *See generally* L. Jaffe, Judicial Control of Administrative Action 424–58 (1965); K. Davis, Administrative Law Treatise §§ 20.01–.10 (1958).

7. *But cf.* Allen v. Grand Central Aircraft Co., 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933 (1954). With thousands of similar proceedings pending at the time, the Court did not require exhaustion before it resolved a pure question of law to find that the administrative proceedings were authorized by statute. In such a case it

was in the interest of over-all efficiency and the orderly functioning of government to stamp the proceedings with early approval.

8. *Cf.* Oestereich v. Selective Service System Local Board No. 11, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (U.S. Dec. 16, 1968); Public Utilities Commission of Ohio v. United Fuel Gas Co., 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1943).

9. *See* Wills v. United States, 384 F.2d 943, 945 (9th Cir. 1967), cert. denied, 392 U.S.

Court has not required exhaustion when faced with a record clearly revealing infringements on the first amendment right of free expression that could not be fully and satisfactorily protected by requiring recourse to the administrative process.[10]

■ A second major premise, essential to support of the rule of exhaustion, is that one has enjoyed fair opportunities to have exhausted the administrative process. In the exceptional circumstances wherein this has not been so, relaxation of the rule may be just and proper.[11]

■ In the light of the foregoing general principles, we are convinced that Craycroft should be required to exhaust his military administrative remedies. We remain especially reluctant to encroach on affairs properly within the military jurisdiction. Article I, section 8, and Article II, section 2, of the Constitution expressly grant Congress and the President the authority to command and regulate the Army and Navy. The Supreme Court has commanded that we be extremely circumspect in considering the complaints of servicemen assertedly aggrieved by military decisions:

"[J]udges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."

Orloff v. Willoughby, 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953). We are aware that civilian courts remain available, in proper situations, to correct abuses by military authorities who, like all governmental authorities, including ourselves, must perform their duties in a manner comporting with the requirements of the Constitution and laws of the United States.[12] Nevertheless, we think that courts should abstain from reviewing complaints of military personnel until military authorities have been given every reasonable opportunity properly to consider these complaints.

Secondly, the District Court's intervention was sought by a person lawfully received into military service and asking to

908, 88 S.Ct. 2052, 20 L.Ed.2d 1366 (1968); Wolff v. Selective Service Local Board No. 16, 372 F.2d 817, 825 (2d Cir. 1967).

10. *See* Keyshian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

11. In Thompson v. United States, 380 F. 2d 86, 88 (10th Cir. 1967), the court wrote, "We agree that failure to exhaust administrative remedies does preclude Thompson from challenging the correctness of his classification, absent exceptional and unusual circumstances underlying the failure to appeal. No such circumstances appear here." We did find these exceptional circumstances in Donato v. United States, 302 F.2d 468, 470 (9th Cir. 1962), cert. denied, 374 U.S. 828, 83 S.Ct. 1868, 10 L.Ed.2d 1052

(1963). In *Donato,* a selective service registrant had been summoned to fire fighting duty during the time for an administrative appeal which he had intended to pursue. Before he returned from the fire fighting mission, the appeal period had terminated. We did not, in such a case, insist on exhaustion. In Wills v. United States, *supra* note 9, 384 F.2d at 945–946, we did not require exhaustion by a selective service registrant who did not receive, as required by federal regulations, a notice of delinquency which would have been materially relevant to his decision as to whether or not to take the administrative appeal.

12. *See* Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958); Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953); Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968).

be relieved of the responsibility of obeying military orders that allegedly conflict with his conscience. The possibilities for disruption of the orderly functioning of the military services are much greater here than in other areas in which the legality of orders affecting the military has been challenged. Judicial action concerning proper Selective Service classification or proper type of military discharge does not, in its effect, create such severe disruption as would occur if the federal judiciary intervened prematurely into complaints from the ranks of lawfully assembled military manpower involving refusals to obey orders pending judicial determination. *See* Brown v. McNamara, 263 F.Supp. 686, 692–693 (D.N.J.), affirmed 387 F.2d 150 (3d Cir. 1967), cert. denied, Brown v. Clifford, 390 U.S. 1005, 88 S.Ct. 1244, 20 L.Ed.2d 105 (1968). This prospect immediately leads us to our third-listed purpose for the rule of exhaustion: the prevention of forum shopping. Chaos could result if military personnel departed from avenues of military consideration of their complaints immediately upon sensing that some civilian court might lend a more sympathetic ear.

█ Exhaustion of administrative remedies by Craycroft might moot or narrow his case or provide a more complete record for review of the complex issues lurking in the background. Since Craycroft has complained of the lack of a fair hearing at any level, a court might eventually be compelled to examine the extent to which military status may deprive one of the right to be accorded the same standards of fairness constitutionally afforded to civilians. Moreover, since Craycroft has been court-martialed for refusal to obey military orders, there is a previously unresolved problem concerning the relation between federal and military courts.[13] It may be that once Craycroft submitted to court-martial, he should be required to exhaust appeal from that proceeding before seeking relief from the federal courts.[14] Craycroft alleges that conscientious objection is not a defense in a court-martial for refusal to obey orders and that exhaustion of military judicial remedies would be futile. Were we to reach this contention, however, we would need to examine the effect of an additional remedy observed by the Supreme Court in United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (U.S. Jan. 14, 1969). We read, at 350, 89 S.Ct. at 530:

> "An additional remedy, apparently now available but not clearly known at the time of these court-martial convictions, is review by the Court of Military Appeals. In United States v. Bevilacqua, 18 U.S.Ct.M.A. 10, 12, decided November 8, 1968, that court held that it has jurisdiction 'to accord relief to an accused who has palpably been denied constitutional rights in any court-martial and that an accused who has been deprived of his rights need not go outside the military justice system to find relief in the civilian courts of the Federal judiciary.'"

Additionally, reaching the ultimate merits of Craycroft's claim would necessitate

13. *Cf.* United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (Jan. 14, 1969); Burns v. Wilson, *supra* note 12, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (no majority opinion), rehearing denied 346 U.S. 844, 74 S.Ct. 3, 98 L.Ed. 363 (separate opinion of Mr. Justice Frankfurter).

14. *See* Gusik v. Schilder, 340 U.S. 128, 71 S.Ct. 149, 95 L.Ed. 146 (1950); Wales v. Whitney, 114 U.S. 564, 5 S.Ct. 1050, 29 L.Ed. 277 (1885); Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968); Noyd v. McNamara, 378 F.2d 538 (10th Cir.), cert. denied, 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967); *cf.* Noyd v. Bond, 402 F.2d 441 (10th Cir. 1968), cert. granted 393 U.S. 1048, 89 S.Ct. 692, 21 L.Ed.2d 690 (Jan. 20, 1969). In the *Hammond* case, unlike Craycroft's situation, an alleged conscientious objector came to the civil courts before the convening of any court-martial. 398 F.2d at 713.

determination, first, of the proper scope of review for examination of the factual basis of his alleged conscientious objector status. Whatever the precise test, it is clear that our scope of review is narrowly limited.[15] Craycroft's further exhaustion of remedies may provide a more complete record upon which to base a decision as to the adequacy or inadequacy of the determination of facts by the Navy.

In reference to our finally stated purpose for requiring exhaustion of administrative remedies, it is possible that the Navy might find that Craycroft should be discharged as a conscientious objector even if the court should uphold the present position of the Navy on the merits. Craycroft could apply to the Board for Correction of Naval Records regardless of the outcome in the civil courts. See Sohm v. Fowler, 124 U.S.App.D.C. 382, 365 F.2d 915, 917 (1966). Similarly, Craycroft could also apply anew for a reconsideration of his application under the new procedures set forth in DD 1300.6 (May 10, 1968).

Numerous courts have required that one exhaust all military remedies before coming to a civil court. See, e.g., Beard v. Stahr, 370 U.S. 41, 82 S.Ct. 1105, 8 L.Ed.2d 321 (1962); Gusik v. Schilder, 340 U.S. 128, 71 S.Ct. 149, 95 L.Ed. 146 (1950); Minasian v. Engle, 400 F.2d 137 (9th Cir. 1968); Anderson v. MacKenzie, 306 F.2d 248 (9th Cir. 1962); Bolger v. Marshall, 90 U.S.App.D.C. 30, 193 F.2d 37 (1951). Specifically, numerous courts have required that a military serviceman apply for relief from his Board for Correction before seeking civil adjudication. See Nelson v. Miller, supra, 373 F.2d 474; Sohm v. Fowler, supra, 365 F.2d 915;[16] McCurdy v. Zuckert, supra, 359 F.2d 491; Schwartz v. Covington, supra, 341 F.2d 537; Reed v. Franke, supra, 297 F.2d 17.

This case presents no reason whatsoever for excepting or relaxing the requirement of exhaustion of administrative remedies. Craycroft's claims may be satisfactorily resolved upon application to the Board for Correction of Naval Records, and there are no exceptional circumstances which have prevented Craycroft from pursuing this remedy. We disagree with the statement in Gann v. Wilson, 289 F.Supp. 191, 193 (N.D.Cal. 1968), that application to the Board for Correction is not necessary for exhaustion of military administrative remedies

---

15. The Supreme Court has adopted a standard of review for selective service classifications under which they must be approved if there is a "basis in fact" to support them. Estep v. United States, 327 U.S. 114, 122–123, 66 S.Ct. 423, 90 L.Ed. 567 (1946); see Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955). But cf. Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953). Some courts have applied the same scope of judicial review to in-service personnel claiming conscientious-objector status. Hammond v. Lenfest, 398 F.2d 705, 716 (2d Cir. 1968); Gann v. Wilson, 289 F.Supp. 191, 193 (N.D.Cal.1968); Crane v. Hedrick, 284 F.Supp. 250, 254–256 (N.D.Cal. 1968). Another court left the scope of review for such cases in a state of uncertainty. See Brown v. McNamara, 387 F.2d 150 (3d Cir. 1967), cert. denied Brown v. Clifford, 390 U.S. 1005, 88 S.Ct. 1244, 20 L.Ed.2d 105 (1968).

16. In Sohm, the D.C. Circuit sharply limited the discretion apparently granted by Ogden v. Zuckert, 111 U.S.App.D.C. 398, 298 F.2d 312 (1961), to lower courts to excuse one seeking judicial relief from application to the Board for Correction of Military Records. In Sohm, the court announced:

"This policy [that administrative remedies should be exhausted], although subject to the exercise of discretion, has been applied by numerous courts in the context of the Boards for Correction of Military Records, and it has evolved to the point where it can be formulated as a rule that the administrative remedy should be exhausted unless the party invoking the court's jurisdiction can demonstrate special circumstances."

365 F.2d at 918.

by an applicant for a conscientious objector discharge. Moreover, in Craycroft's situation, he now can attempt to pursue the further remedy of applying under the new procedures for conscientious objector determination under DD 1300.6 (May 10, 1968).

### 3. Should the District Court have granted interlocutory relief?

Having determined that Craycroft has not exhausted his military administrative remedies, we are called upon to decide whether the District Court should have issued an interlocutory order staying the Navy's order that Craycroft report for active duty or enjoining court-martial sanctions against him pending his exhaustion of military remedies. We approved a District Court order staying the Army's issuance of an undesirable discharge in the leading case of Schwartz v. Covington, 341 F.2d 537 (9th Cir. 1965). That order was to remain in effect pending review by the Board for Correction of Military Records and, if necessary, by the District Court. Such an order is sometimes appropriate to alleviate the harsh effects upon an individual who must exhaust his administrative remedies before seeking judicial relief.

The traditional criteria for determining the appropriateness of a stay order pending administrative determination were set forth in Schwartz at 538:

(1) likelihood that the subject person would prevail on the merits of an appeal from the administrative process to the court;

(2) irreparable damage to the subject person if a stay is not ordered;

(3) no irreparable damage to the other parties or the public from a stay order.

The military serviceman's case in Schwartz met all three of these criteria. It was thought likely that he would prevail in a court challenge, inasmuch as his undesirable discharge was based on alleged homosexual conduct during an enlistment from which an honorable discharge was given, prior to his then current enlistment. Secondly, the stigma from such an undesirable discharge, even if the serviceman were later reinstated after administrative appeal, would, we believed, constitute irreparable injury. Finally, the serviceman was at the time doing excellent work as a hospital orderly, and no significant harm to the Army or the public from his continuing in that capacity could be predicted. 341 F.2d at 538.

The Third Circuit has followed our Schwartz criteria in the recent case of Nelson v. Miller, 373 F.2d 474 (3d Cir.), cert. denied, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967). Like Schwartz, the Nelson case involved a discharge based on alleged homosexual conduct, but in Nelson the discharge was honorable and without assigned reasons. The serviceman had exhausted all pre-discharge administrative remedies, but, if discharged, the Board for Correction of Naval Records would have been available. The court agreed that no harm would result to the Navy or the public if the serviceman were retained in the service pending his exhaustion of remedies by appeal to the Board. The court, however, sustained the District Court's finding that no irreparable harm to the serviceman was shown, as the discharge was honorable and post-discharge review was available. Therefore, the court decided that it did not need to reach the issue of estimating the likelihood of the serviceman's prevailing on the merits in an ultimate civil judicial proceeding. The District Court's denial of a stay order was affirmed on its finding of no threatened irreparable harm to the party seeking relief. 373 F.2d at 478.

The Fifth Circuit in McCurdy v. Zuckert, 359 F.2d 491 (5th Cir.), cert. denied, 385 U.S. 903, 87 S.Ct. 212, 17 L.Ed.2d 133 (1966), denied a stay order pending exhaustion of remedies by appeal to the

Board for Correction of Military Records. The District Court had issued the order on the basis of our criteria in *Schwartz, supra.* In reversing, the Court of Appeals found that, whatever might be said of the stigma attached to an undesirable discharge, no sufficient irreparable injury followed the issuance of a general discharge. 359 F.2d at 494. The Fourth Circuit has also required a serviceman to apply for relief to his Board for Correction, affirming the denial of temporary and permanent injunctions against the issuance of a general discharge. Reed v. Franke, 297 F.2d 17 (4th Cir. 1961).

■ Analyzing Craycroft's case in terms of the criteria set forth in *Schwartz,* we conclude, on the basis of the record now before us, that we simply do not have the necessary background upon which to picture a likelihood of Craycroft's ultimately prevailing on the merits in the civil courts. Of particular weight is the limited scope of review, whatever the standard,[17] which the District Court would eventually be required to apply in reviewing the Navy's factual determination of Craycroft's status as an alleged conscientious objector. The federal courts must apply the greatest restraint in the granting of interlocutory relief which interferes with the military's exercise of its authority over persons lawfully entered into its service and who may be refusing to obey any orders whatsoever. Craycroft's detention pursuant to court-martial while he continues to insist that his disobedience is grounded in his conscientious objection to continued military service is a disturbing factor, but it cannot outweigh the far graver considerations that have moved us to conclude that the District Court made the proper disposition.[18]

Affirmed.

17. See note 15, *supra.*

18. We have not intended to express, and we do not express, any opinion as to the course of action which the District Court might properly take in the event one in Craycroft's position should eventually

be able to allege and prove that unreasonable delay in the processing of invoked administrative remedies had occurred or was threatened. *Cf.* Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed. 2d 22 (1965).