**Charles Ray EMERSON, Petitioner-Plaintiff,**

**v.**

**Colonel William A. McKEAN et al., Respondents-Defendants.**

**Civ. A. No. 71-81.**

United States District Court, N. D. Alabama, E. D.

Feb. 11, 1971.

Drake & Knowles, University, Ala., for petitioner-plaintiff.

Henry Frohsin, Asst. U. S. Atty., Birmingham, Ala., for respondents-defendants.

Memorandum of Decision

POINTER, District Judge.

On January 29, 1971, the petitioner, Charles Ray Emerson, filed an amended petition seeking a writ of habeas corpus to compel his discharge from the Army as a "conscientious objector" (hereafter sometimes referred to as a "C.O."). In response to a show cause order, his commanding officers at Fort McClellan, Alabama, filed an answer and a certified copy of the "file" which had been before the Department of the Army when it denied Emerson's application for discharge as a C.O. A hearing was held on this answer on February 5, 1971, at which time counsel presented oral and written arguments in support of their respective positions. Appearing on behalf of petitioner: Jack Drake and Ralph Knowles, Attorneys, Tuscaloosa. Appearing for respondents: Henry I. Frohsin, Assistant U.S. Attorney, Birmingham. The cause was taken under advisement by the court to allow study of the "file" and of arguments of the parties.

Charles Ray Emerson was inducted into the Army in July 1969. He did not apply prior to induction for classification as a C.O. Indeed, the first formal manifestation by him of an opposition to

the war and to his continuing in the Army came on October 12, 1970, some fifteen months after entry on active duty, when he requested application papers under Army Regulation 635–20.

His completed application for discharge as a C.O. was submitted on October 26, 1970, through his immediate commanding officer, Captain Louis H. Caruso. It contained the minimum information specified in paragraph 4a of the AR and, in addition, was supplemented by signed statements from his squad leader, his platoon sergeant, and three representatives of religious organizations. Each attested to the sincerity of Emerson's pacifism.[1] Chaplain Woodall, after the interview prescribed in the AR, came to the same opinion and believed this opposition to be based on religious principles held by Emerson.[2] On the psychiatric interview Emerson was not reported to suffer from any disorders but instead was found to be an individual "mentally responsible, able to distinguish right from wrong and to adhere to the right."

Captain Donald Buchanan, the officer "knowledgeable in policies and procedures relating to conscientious objector matters" (AR 635–20, paragraph 4d), submitted a recommendation that Emerson's application be disapproved. The

---

1. Sgt. Schoenewald, his squad leader, stated: "I have to say that I disagree with his ideas about war and participation in the Army, but can say in good conscienious [sic] that he is sincere in his application. Since I have been aquainted [sic] with SP4 Emerson, approximately seven months, I have known him to be a deeply religious sincere individual. More recently, or for about the last two months, I have notied [sic] a change in him to act according to his beliefs. * * * I believe SP4 Emerson's ideas about being opposed to war and participation in any military organization is genuine and frank." SFC Gomez, his platoon sergeant, said: "I * * * have been platoon sergeant of Smoke Platoon * * * for several months. During this time SP4 Charles Emerson has been my platoon clerk. As for [sic] as I know he has done a fine job for my platoon and the company. * * * I can honestly say that SP4 Charles Emerson ideas are some of the strangest I have ever heard. I am not sure if I understand what he is talking about when he tells me about his ideas of war and killing other people. * * * I believe that whatever SP4 Charles Emerson says, he believes, and am convinced that he is telling the truth in his application." Vernon L. King, Director of the Mennonite Central Committee, wrote "to witness to the sincerity of Charles R. Emerson in his belief that war is morally wrong and in direct conflict with his religious beliefs. I have no questions about Charles' sincerity in his objection to war and his inability to kill or to be a part of killing. * * * The sincerity of conscience in Charles'

case is valid." Reverend Alan M. Dillman, Office of Urban Affairs Catholic Center, wrote on behalf of Emerson "who strikes me as being sincere in his efforts to be discharged as a conscientious objector. While he is not a Roman Catholic I feel that his very Fundamentalist views should be considered. He bases much of his objection to war and killing on the Sermon on the Mount. I hope that his conscience will be respected and that he will be given every consideration in his request." Donald R. Bender, Quaker House Program Coordinator in Atlanta, wrote: "I know Mr. Emerson and find him to be a Christian of deep conviction. As a searching sincere person, I have seen him reach the position where he feels he cannot participate in the Army. I do not completely understand his religious viewpoint, but I know it is a sincere one. * * * [H]is integrity is beyond question."

2. "It is my opinion that Specialist Emerson is sincere in his conviction as a conscientious objector. He is a member of an Independent Baptist Church, having joined that denomination as a young boy. His commitment to Christ is very real and I believe he is sincere in his pacifist views. It is my opinion that Specialist Emerson's conscientious objection is based on religious principles. The source for his belief is based more on his own convictions than a specific teaching of his church. Specialist Emerson is somewhat his own guide and source in this matter. I have consulted with Chaplain (Major) Donald C. Beeson on this point and we both concur."

reasons assigned by Captain Buchanan for this recommendation were:

> No definite date can be determined as to when his conscientious objection became fixed. Individual states that he had ideas against wars but no objections until after entry into the military service. He has been on active duty since 16 July 1970 [sic] and has managed to live with his " * * * very strong feelings against war * * * " On 8 October 1970 he was notified of his assignment for Viet Nam. While in basic (27Aug69) he qualified as expert with the M-14.

DD # 1589, a Summary Sheet, was then prepared. As an explanation for Emerson's not having applied for C.O status prior to induction, it contained this comment: "Individual has stated that at time of entry into the service his beliefs and ideals had not yet matured and that while on active duty the conception of the military has changed."

■ The final item[3] in the file was the recommendation by Captain Caruso that the application be disapproved and his reasons therefor:

> There is little reason to doubt this individual's deep sincerity in his beliefs and convictions against violence of any kind and particularly killing. However, his emotional ties with his family and wife probably were a strong motivating force in his decision to apply for discharge as a conscientious objector. While his professed religion teaches that violence and killing are evil and immoral, it further states that the individual's conscience must be the determining factor of right and wrong. His receipt of orders to Vietnam was the motivating factor in his application. The relative weight of his beliefs that violence and war are evil to the thought of family separation and emotional insecurity cannot be determined, but it can be construed that the latter was very important to the individual. His failure to make known his beliefs at the time of induction and the absence of evidence that these beliefs were held prior to induction and became fixed while in the service are also prejudicial to favorable consideration of his application (para 3b, AR 635–20),[4] (underlining by Captain Caruso)

Paragraph 4a(4) of AR 635–20 provides for the applicant to furnish the names and addresses of persons "who could supply information as to the sincerity of the applicant's professed convictions regarding participation in war." Emerson submitted this information about four persons, but, so far as appears from the file, the Army never even attempted to contact such persons.[5]

On December 28, 1970, the Department of Army's C.O. Review Board disapproved Emerson's application upon a finding that "the member's request is based *solely* upon considerations of policy, pragmatism or expediency." (Emphasis added). On January 20, 1971, notification procedures were commenced by the Department of Army to advise him of the denial of his application. Emerson apparently received verbal notification of this action on January 26, 1971, and the original petition was filed in this court two days later.

---

3. The endorsements by intervening adjutants (concurring in recommending disapproval) add nothing to the "facts" upon which the Army Review Board was to make its decision.

4. Although not clear, it appears that Captain Caruso may have interpreted the regulations to allow discharge only if based on beliefs held prior to induction (which became fixed while in the service)—such an interpretation would, of course, be erroneous.

5. One of the four was Sergeant Schoenewald, who had given the supporting letter to Emerson. Schoenewald was quite accessible to Army authorities had they desired to verify or clarify any of the comments made by him regarding Emerson's sincerity or when such beliefs became crystalized into conscientious objection to war.

Jurisdiction is premised upon 28 U.S.C. § 2241. "Custody" for purposes of the eligibility to apply for habeas corpus includes the restraint on one's liberty resulting from service on active duty in the armed forces. Brown v. McNamara, 387 F.2d 150 (3rd Cir. 1967), cert. denied 390 U.S. 1005, 88 S. Ct. 1244, 20 L.Ed.2d 105 (1968); United States ex rel. Brooks v. Clifford, 409 F. 2d 700 (4th Cir. 1969); Cushman, "The 'Custody' Requirement for Habeas Corpus," 50 Mil.L.Rev. 1 (1970) (DA Pam 27–100–50, 1 October 1970). The custody complained of was within the "respective jurisdiction" of this court as required by 28 U.S.C. § 2241—the petitioner being stationed at Fort McClellan, Alabama, and the two military respondents being officers at such post in his chain of command. *Cf.* Ahrens v. Clark, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948).

This court has jurisdiction, and it is not necessary that the petitioner delay his application here until after an appeal to the Board for Correction of Military Records. Pitcher v. Laird, 421 F.2d 1272 (5th Cir. 1970). Accord, United States ex rel. Brooks v. Clifford, *supra*; Hammond v. Lenfest, 398 F.2d 705 (2nd Cir. 1968). *Contra*, Craycroft v. Ferrall, 408 F.2d 587 (9th Cir. 1969); Noyd v. McNamara, 378 F.2d 538 (10th Cir. 1967).

Though the court has jurisdiction, its scope of inquiry is quite limited. In part this is due to policy considerations—the doctrine of separation of powers, coupled with the responsibility for national defense which the Constitution places upon the legislative and executive branches of government. Hammond v. Lenfest, 398 F.2d 705, 710 (2nd Cir. 1968). Moreover, the courts have not—at least to this date—recognized any *right* under, for example the First or Ninth Amendment to discharge from military duty based on conscientious objection to war. But see Brahms,

"They Step to a Different Drummer: A Critical Analysis of the Current Department of Defense Position vis-a-vis In-Service Conscientious Objectors," 47 Mil.L.Rev. 1, 4–18 (1970) (DA Pam 27–100–47, 1 January 1970). Instead, the theory of relief is that detention (*i. e.*, retention in service) becomes "unlawful" for purposes of a habeas corpus writ when the military fails to grant a discharge in accordance with its own (voluntary) regulations. See Pitcher v. Laird, 421 F.2d at 1278 (5th Cir. 1970), and cases cited.

This scope of review—which has been described[6] as "the narrowest known to the law"—is limited to the determination of whether "there was any basis in fact" for the action of the Army's Review Board, a determination which is to be made by the court by considering "only the evidence before the deciding agency [the Review Board]." Application of Tavlos, 429 F.2d 859 (1970). The test has been sometimes stated in terms of any basis in fact for denying the application, and, other times as any basis in fact for reaching the conclusions which were relied upon by it in denying the application.

In the case *sub judice* the Army raises no challenge to the substance of Emerson's beliefs as reported by him—in effect, it acknowledges that, if such beliefs are actually held by him and were the motivating reason for his application, they would be of the sort that would entitle him to discharge under AR 635–20.[7] What the Army says is that the *sole* reasons for his making this application were "policy, pragmatism or expediency". This is a type of challenge to his sincerity which, though subjective in nature, requires objective support, typically through inconsistent statements or actions. See United States v. Davila, 429 F.2d 481 (5th Cir. 1970); United States v. Wingerter, 423 F.2d 1015 (5th Cir. 1970); Kessler v. United States, 406 F. 2d 151 (5th Cir. 1969).

---

6. Robertson v. United States, 417 F.2d 440, 444 (5th Cir. 1969).

7. For this reason Emerson's stated beliefs will not be detailed in this opinion.

None of those having personal contact with Emerson raised a question as to the sincerity of his religious beliefs. Those who disagreed with him, or could not understand him, were nevertheless convinced that he was honest in the statement of his convictions. The Army does not in this proceeding directly challenge that a change or solidification of beliefs occurred in Emerson after his induction and while in the service —indeed, his participation and activities in the service are fully consistent with his statements as to the transformation of his religious beliefs into a conviction of conscience during his military service.

In its denial of Emerson's request the Board listed the facts upon which its conclusion was based.[8] The matters recited are directed at the timing of this application—but, under the regulations it is also necessary that the convictions not have been held prior to entry on active duty; in short, if the applicant has (as here) served for a significant length of time before making application, the skeptic would doubt the sincerity of his belief, whereas if the applicant were to make the application only shortly after entering the service, the skeptic would doubt that the conviction had developed

since induction. Also see United States v. Lemmens, 430 F.2d 619 (7th Cir. 1970). Bishop v. United States, 412 F.2d 1064 (9th Cir. 1969) does not hold that timing of an application, when otherwise explained, is in and of itself sufficient reason for disbelief of the applicant. Application of Coryell, 307 F. Supp. 209 (N.D.Cal.1969) is distinguishable on its facts from the present case.

In asserting that considerations of policy, pragmatism and expediency were the "sole" basis for Emerson's request, the Review Board no doubt was appreciative of the problem of concurring motivations. Pitcher v. Laird, 421 F.2d 1281 (5th Cir. 1970); United States ex rel. Brooks v. Clifford, 409 F.2d 700 (4th Cir. 1969); Fleming v. United States, 344 F.2d 912 (10th Cir. 1965). Such a conclusion, however, this court is convinced, has no basis in fact in the record before the Board. It well may be that the Board would have been justified in concluding, as apparently did Captain Caruso, that Emerson's application was precipitated by two forces, his religious convictions and his concerns for his family and himself. But to deny any impact of Emerson's religious beliefs, which were acknowledged by all, is not

---

8. "The member's been on active duty approximately 16 months during which time he has had no trouble functioning as a soldier within his religious beliefs. While in basic training he qualified as an expert with the M–14 Rifle. In his application the member states "My beliefs began to solidify through bayonet training, firing at the human shape targets, and the reality of mass killing through chemical warfare." The Board notes that most of the incidents listed which aided the member in solidifying his beliefs occurred during basic and AIT training. Normally, this training lasts a total of 16 weeks or four months. However, during the intervening year, between that training and this application the member offered no information for the Board to consider in determining when these views became fixed. It was not until after the member received his orders for reassignment to the Republic of Vietnam that he found his request for discharge as a "conscientious objector." Sudden excessions of belief may be utterly sincere, such as the memorable one on the Damascus road; but they seldom syncronize so perfectly as (Emerson's) with external facts making them convenient * * * U. S. v. Corliss [2 Cir., 280 F.2d 808, 812]. The timing of SP4 Emerson's application casts serious doubt on the sincerity of his professed beliefs and his application does little to remove that doubt." The Board apparently did not attempt to verify Emerson's statement that "my beliefs were reenforced when, at the last rifle qualification, I could not bring myself to fire at anything that reminded me of another human being, and went down on record as being unqualified."

based on facts, and is not a reasonable inference from facts, in this record.[9] The petition for the writ of habeas corpus will therefore be granted.

9. Implicit in the position of respondents is the assumption that considerations of policy, pragmatism and expediency are foreign to religious convictions or matters of conscience. It seems doubtful to this court—though we need not here decide—that such limitation can be sustained under even orthodox theological systems.