492 F.2d 1367
 UNITED STATES of America, Plaintiff-Appellee,
v.
Lee STEPHENS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alfonse BARTKUS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Milton SILVERMAN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sam NORBER, Defendant-Appellant.
 Nos. 73-1334-73-1337.
 United States Court of Appeals, Sixth Circuit.
 Argued Oct. 18, 1973.
Decided Feb. 28, 1974.
 
 Joseph P. Zanglin (Court Appointed), Detroit Mich., on brief for Lee stevens.
 W. Robert Chandler (Court Appointed), Detroit, Mich., on brief for Bartkus.
 Noel L. Lippman, Warren, Mich., on brief for Silverman.
 Sanford Rosenthal, Southfield, Mich., on brief for Norber.
 Kirby Patterson, U.S. Dept. of Justice, for appellee; Ralph B. Guy, Jr., U.S. Atty., Detroit, Mich., Robert L. Keuch, Atty., Dept. of Justice, Washington, D.C., on brief.
 Before PHILLIPS, Chief Judge, CELEBREZZE and LIVELY, Circuit Judges.
 LIVELY, Circuit Judge.
 
 
 1
 The four appellants and two others were jointly indicted for conspiracy to violate Title 18 U.S.C. 2314, 2315 and 2 'by fraudulently and unlawfully transporting and causing to be transported in interstate commerce, goods and merchandise of a value exceeding $5,000 knowing the same to have been stolen, and receiving, storing, bartering, selling and disposing of goods and merchandise of a value exceeding $5,000 moving in interstate commerce, knowing the same to have been stolen.' The indictment then described the part which each of the defendants allegedly played in the conspiracy and set forth a number of overt acts and the dates on which these acts were performed by various defendants. The indictment contained five counts relating to the alleged conspiracy, the various overt acts and charges of aiding and abetting. One defendant, Wayne Wakeford, was dismissed and a jury trial began on January 4, 1972 with the four appellants and one Robert 'Bobby' Kahn as joint defendants. On February 9, 1972 this jury reported that it was unable to reach a verdict and was discharged. Prior to the commencement of the second trial the defendant Kahn pled guilty. On August 1, 1972 the jury returned a verdict finding the defendants Norber, Bartkus, Stephens and Silverman guilty as charged in count I of the indictment. Norber and Bartkus guilty under counts II and III and Silverman guilty under counts IV and V. The four appeals were consolidated and heard together in this court.
 
 
 2
 The goods which were stolen consisted of a truck-type trailer loaded with Bayer aspirin and other non-prescription drug products which was shipped from the Glenbrook Laboratories of Sterling Drug Company in Trenton, New Jersey to a distribution point at Chicago, Illinois on January 12, 1970. The shipment was by rail and it was proven that the trailer arrived at the Penn Central yard in Chicago. The loaded trailer disappeared from the Penn Central yard in Chicago before it could be delivered to the consignee and the empty trailer was found on a street in Chicago on January 19, 1970. All of the aspirin was not recovered but cases of aspirin identified as being parts of the shipment were recovered from a truck driven by the defendant Silverman in Detroit, from a building identified as the Castle City Furniture Company in Detroit and from a discount store in Cincinnati whose manager testified that it had been purchased from the defendant Silverman. The testimony of Sal Caracappa, an independent trucker, provided important links in the chain of conspiracy.
 
 
 3
 Caracappa testified that he was contacted on January 20, 1970 by Bobby Kahn whom he had known for about 15 years and hired to run a load of stolen aspirin from Chicago to Detroit. He was told by Kahn that the stolen cargo would be in a legitimate trailer to be picked up at Middle West Freight Lines in Chicago on the morning of January 21. When Caracappa arrived at the appointed place and met with Kahn he checked the loaded trailer and found that it did contain Bayer aspirin. Kahn rode part of the way to Detroit with Caracappa, but left the truck before it arrived at its destination. Caracappa then drove on to Detroit and pulled into a truck stop which had been designated by Kahn and waited in a conspicuous place. After a while a man identified by Caracappa as the defendant Stephens came to his truck and said, 'I'm your man here in Detroit.' Later in the evening of January 21 Caracappa was at the home of the defendant Stephens when four people arrived. These were identified as Bobby Kahn, a young woman named Marianna Soots, the defendant Norber and the defendant Bartkus. About 10:00 o'clock that night Caracappa overheard a conversation among the other men at Stephens' house concerning the ownership of the cargo. He went back to his truck and spent the night in the cab.
 
 
 4
 Caracappa then testified as to events which occurred on January 22 involving Norber, Kahn, Stephens and Bartkus. Before the day was over the trailer which Caracappa had brought from Chicago was unloaded at a warehouse near Fourth and Grand River in Detroit. The crew which unloaded the trailer was in the charge of Lee Stephens, and Kahn and Bartkus directed where the cartons which were taken from the trailer were to be placed on the second floor of the building. The witness testified that all four of the other men were involved in discussions concerning the unloading and placement of the cargo and that he saw Norber give an envelope containing money to Kahn. Thereafter Kahn paid Caracappa for hauling the goods. He also testified that he saw yellow slips of paper containing an inventory of the load while at Stephens' house and he positively identified the contents of the trailer as Bayer aspirin, Midol and related products.
 
 
 5
 The witness Wayne Wakeford was originally indicted with the appellants, but the charges against him were dismissed prior to the first trial. He was an employee of the defendant Silverman, who also did business as Scot Beauty Supply, and he testified to activities in which he, Silverman, Norber and Stephens were involved in moving smaller loads of Bayer aspirin in Detroit and from Detroit to Cincinnati, Ohio. The testimony of Wakeford related the movement of cases of aspirin to the Castle City Furniture storeroom and he also testified to a visit to the warehouse at Fourth and Grand River with Silverman at which time he saw 800 to 1,000 cartons of Bayer aspirin on the second floor. His testimony concerning the storage of Bayer aspirin at Castle City Furniture, meetings at Greenfield's Restaurant, the visit to the warehouse at Fourth and Grand River and the delivery by Silverman of aspirin to a discount store in Cincinnati all verified previous testimony given by Detective Sergeant Hagstrom of the Michigan State Police who had conducted a surveillance of Silverman in January and February of 1970. On February 18, 1970 Silverman and Wakeford were arrested by Michigan authorities. Cases of Bayer aspirin were seized from a U-Haul truck that they were driving at the time of their arrest and from the Castle City Furniture building all pursuant to a search warrant issued after their arrest. These were later identified as being included in a group of cartons introduced in evidence.
 
 
 6
 The general manager of the discount store in Cincinnati who had purchased two loads of aspirin from Silverman testified that they were offered to him at 18 to 20 per cent below cost. Some of the aspirin were sold immediately to a business known as Goldsmith operated in the same building with the discount store, and in turn portions of this purchase by Goldsmith were traced to two other wholesale druggists in the Cincinnati area. Some of the cartons of aspirin received by each of these four Cincinnati businesses were recovered by the FBI and introduced into evidence along with those taken from the U-Haul truck and the Castle City Furniture storeroom. The labels had been cut from the boxes recovered in Cincinnati, which corroborated the testimony of Wakeford that the cases of aspirin which he hauled to the Castle City Furniture storehouse had had the labels cut.
 
 
 7
 Two employees of Glenbrook Laboratories testified. The witness Bannister was the shipping foreman at Trenton, New Jersey on the date the merchandise which eventually disappeared was loaded and dispatched. He described the use of control numbers by the manufacturer that served to identify the particular batch from which each container of aspirin was manufactured. He stated that this control number appeared at two places on each carton of aspirin and that the cartons also contained consecutive numbers and that this information was noted on a withdrawal sheet as the cases of aspirin were loaded on the trailer. He introduced the withdrawal sheet, the bill of lading for the particular shipment which was later stolen and the control sheets which gave further information about each control item. He described in great detail the contents of the trailer, identifying the number of cases of aspirin and other products, broken down as to the size containers in each case. He further stated that the control number appears on each bottle and tin of Bayer aspirin in addition to appearing on the shelf carton in which they are enclosed and on the shipping case. The witness pointed out that some of the cartons were mixed cases. These were cartons which contained aspirin made from the last portion of one batch of ingredients and the first part of the next succeeding batch. These cases contained two sets of control numbers and were specially designated with a white sticker. The witness testified that it would be impossible for a box containing the numbers shown on the various shipping documents which were filed as exhibits to have gone to any destination except Chicago. He also stated that an empty shipping case later recovered could be identified as part of a particular shipment.
 
 
 8
 Edward Mannix testified that he was director of quality control at the Glenbrook Laboratories in Trenton, New Jersey both at the time that the stolen products were shipped and at the time he testified. He described the use of control numbers to identify batches of aspirin mix, corroborating the testimony of the witness Bannister. Mannix stated that after the FBI had recovered aspirin which it believed was stolen he went to the bonded warehouse where it was stored and checked the control numbers and contents of each box, making a list as he went along. He identified cartons which had been brought to the courtroom by the prosecution as being those which he had checked either in the bonded warehouse or in the marshal's office, always in the company of FBI agents. He testified that cartons of products shown to him at the warehouse and in the marshal's office and exhibited to the jury were part of the shipment from Trenton to Chicago which disappeared. He stated that no two split cases of aspirin could ever be identical and that these could always be positively identified. Six such cartons were identified by the witness. An FBI agent named O'Neil testified to receiving 233 cases of aspirin and other Glenbrook products from the Michigan authorities and storing them in the bonded warehouse where Mannix examined them. He identified the cartons exhibited in the courtroom as being among those which had been in the possession of the FBI.
 
 
 9
 It would unduly extend this opinion to discuss every claim of error which the appellants have asserted in their briefs and in oral argument. The trial of the case consumed eight weeks and we have examined the transcript which consists of nearly 4,000 pages. While separate briefs were filed by the four appellants, each adopted many of the arguments in the briefs of the others and some of the alleged trial errors affected all of the defendants.
 
 
 10
 All four of the appellants were convicted of the conspiracy charge. The defendants maintain that it was error to submit this case to the jury as a 'chain conspiracy,' and that if the conspiracy issue was properly submitted at all, the evidence disclosed two separate conspiracies rather than a single one. Reliance is placed on United States v. Peoni, 100 F.2d 401 (2d Cir. 1938), where the court refused to permit the prosecution to link together the activities of two people as a conspiracy in the absence of evidence that there was a concert of purpose between them. In this case, however, according to Caracappa, when Bartkus and Kahn followed the stolen merchandise from Chicago to Detroit they met the same day with Norber at the Stephens residence. When the other alleged conspirators, Silverman and Wakeford, entered the picture four or five days later they were seen going to the residence of Norber and then to the warehouse at Fourth and Grand River where the stolen merchandise had originally been unloaded and stored. The defendant Norber is thus shown to have been in contact with Bartkus and Kahn immediately upon their arrival in Detroit, to have been involved in the unloading and storage of the merchandise in that city and to have been in contact with Wakeford and Silverman at the time of the removal of part of the shipment to the Castle City Furniture storeroom. It is not necessary that each member of the conspiracy be a member of it from the beginning so long as each joins it while it is still in operation. United States v. Jackson, 422 F.2d 975 (6th Cir. 1970). We do not believe that the conspiracy ended, as a matter of law, when Bartkus and Kahn delivered the merchandise to Norber and Stephens. The jury was properly permitted to consider whether the actions of all the named conspirators were in furtherance of a single plan to transport and dispose of interstate merchandise which they knew to have been stolen. Possession by one of goods shown to have recently been stolen is sufficient to make a prima facie case that the person in possession knew of the stolen nature of the goods. Barnes v. United States,412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); United States v. Winbush, 428 F.2d 357 (6th Cir.), cert. denied, 400 U.S. 918, 91 S.Ct. 179, 27 L.Ed.2d 157 (1970). We believe that the circumstantial evidence of involvement in the charged conspiracy by each of the four appellants is sufficient to support the jury verdict. Schwachter v. United States, 237 F.2d 640 (6th Cir. 1956).
 
 
 11
 All of the defendants objected to the admission in evidence of the cartons of aspirin and other products seized by the officers in Detroit and Cincinnati. The basic claim was that these cartons were not properly identified as being part of the stolen shipment. The trial judge correctly ruled that the exhibits in question should be received. The witness Mannix positively identified six of the cartons as being part of the shipment from Trenton to Chicago and he and the witness Bannister confirmed that the other cartons and their contents contained control numbers which were the same as those appearing on other items in the stolen shipment. Both of these witnesses were subjected to vigorous cross-examination intended to cast doubt on the identification of these very exhibits. The principles enunciated by this court in United States v. Langley, 466 F.2d 27 (6th Cir. 1972), are controlling. It is immaterial that the government was not able to recover and produce all of the merchandise from the stolen shipment or that all of it could not be positively identified in the same way as the six mixed cases. The evidence discloses a sufficient identification of the stolen merchandise, detailed testimony of surreptitious movement of large quantities of the same kind of merchandise and the ultimate recovery of merchandise bearing identifying numbers which coincided with those known to have been affixed to portions of the stolen shipment. From all of this evidence the jury could reasonably infer that the cartons of aspirin and other products recovered from Silverman and Wakeford and those who purchased from them were part of the stolen shipment. A case with many features similar to this one in which the same result was reached is United States v. DeKunchak, 467 F.2d 432 (2d Cir. 1972).
 
 
 12
 An issue raised by several of the appellants concerns the failure of the prosecution to produce Bobby Kahn as a witness. At the time of the second trial, Kahn had pled guilty to several of the charges in the indictment upon which appellants were tried and was awaiting sentencing. When Caracappa was first asked to relate a conversation between him, Kahn and Bartkus, the defendants objected on the ground that they would be denied their right of confrontation unless the government planned to produce Mr. Kahn as a witness. One of the prosecuting attorneys responded that defense counsel knew that the government could not call Mr. Kahn to the witness stand in the case.[1] Later a motion for mistrial was based on this statement of the prosecutor and lengthy arguments were had as to whether the government could call Kahn as a witness and whether he could exercise a Fifth Amendment right to remain silent after having pled guilty. The court denied the motion for mistrial and asked the parties to brief the question. We believe the court correctly ruled on the motion for mistrial since the single comment of the prosecutor concerning the government's ability to require Kahn to testify was not prejudicial in the entire context of the proceedings. This does not dispose of the matter, however. Late in the trial the prosecuting attorney announced that the government proposed to call Robert Kahn as its next witness. The court had previously appointed an attorney to advise Mr. Kahn of his rights in the event either side should call him. This was the same attorney who had represented Kahn at the first trial. This attorney informed the court that he had advised Kahn that he had an absolute right to refuse to testify and that it would be a violation of his Fifth Amendment rights to call him as a witness. The court then indicated that the government could not call Kahn as a witness. There was no request that Kahn be granted immunity.
 
 
 13
 The statement by Caracappa that Kahn told him that his cargo would be stolen aspirin was clearly hearsay. Having admitted this testimony as the statement by one of the co-conspirators made in furtherance of the conspiracy the court erred in denying Bartkus the right to confront and cross-examine Kahn. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). While Kahn's guilty plea to the federal charges did not deprive him of the right to assert his Fifth Amendment privilege against incrimination on any possible state charge, nevertheless he should have been required to take the witness stand and assert the privilege in response to particular questions. United States v. Seavers, 472 F.2d 607 (6th Cir. 1973). Then if Kahn refused to answer questions about his alleged statement to Caracappa that the aspirin was stolen, the court had the responsibility to determine whether an answer could be required. Since the government created the situation by electing to introduce hearsay rather than direct evidence from Kahn that the aspirin was stolen, it ran the risk that Kahn would endanger the prosecution by refusing to testify and corroborate Caracappa. It could have offered Kahn immunity, but chose not to. Nevertheless Kahn's assumed Fifth Amendment right, which was improperly invoked by a refusal even to be sworn as a witness, could not be used as a means of depriving Bartkus of his Sixth Amendment right to confront and cross-examine his accuser. Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Although the other appellants have claimed prejudice, we find that Bartkus was the only one whose fundamental rights were affected by the court's ruling.
 
 
 14
 Another Fifth Amendment issue arose when Caracappa refused to answer certain questions on cross-examination. One such question concerned the identity of the person to whom he had sold three cases of aspirin which he testified he stole from the trailer between Chicago and Detroit. However, there was no objection to his refusal to answer this question and it is not before us. The other questions which Caracappa refused to answer on Fifth Amendment grounds related to a different load of aspirin which he hauled in 1970. It was apparently the theory of the defense that he had confused this load with the one which he hauled on January 21 of the same year. The appellants maintain that the entire testimony of a key prosecution witness should be stricken if he refuses to answer questions upon cross-examination. This question was carefully considered in United States v. Cardillo, 316 F.2d 606 (2d Cir.), cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963), where the court held that there are three categories of testimony which require different action by the trial court when there is a refusal to submit to cross-examination. If the answer sought would have been so closely related to the crime for which the defendants were being tried, that the defendants may be substantially prejudiced by being deprived of their right to test the truth of the witness' direct testimony, the entire testimony of the witness should be stricken. If the subject matter of the testimony is connected with only a part, but not all, of the case being tried, a partial striking of the witness' testimony might suffice. The third category consists of testimony involved in collateral matters or cumulative testimony concerning credibility. The refusal of a witness to submit to cross-examination on such matters as these does not require that any testimony be stricken, but can be handled by a charge to the jury. See Fountain v. United States, 384 F.2d 624 (5th Cir. 1967), cert. denied sub nom., Marshall v. United States, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968).
 
 
 15
 The general rule is that a witness who has testified to incriminating matters on direct examination has waived the privilege as to those matters and may not decline to answer on Fifth Amendment grounds when cross-examined. Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951). The basic inquiry in a situation such as is presented here is whether there has been an adequate confrontation between the accused and the accuser to satisfy the confrontation clause of the Sixth Amendment. Dutton v. Evans, 400 U.S. 74, 97, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), (concurring opinion of Mr. Justice Harlan). An examination of the transcipt reveals that Caracappa was carefully and intensely cross-examined about every detail of his testimony concerning his meeting with Kahn and Bartkus, the movement of the aspirin from Chicago to Detroit and his observations of the activities which took place after his arrival at Detroit.
 
 
 16
 The questions in response to which he invoked the Fifth Amendment concerned an entirely unrelated trip which he had purportedly made. At best this was a collateral matter, not directly connected to the transactions for which the defendants were being tried. As such, it was clearly within the discretion of the court to decide whether the invocation of the Fifth Amendment and refusal to answer questions on cross-examination required that the entire testimony of the witness be stricken. We find no abuse of discretion in the court's ruling in this regard. If the purpose of this cross-examination was to cast doubt upon the credibility of Caracappa, it was cumulative evidence. There was no effort by the government to conceal Caracappa's past or current troubles with the law, and counsel for the defense availed themselves of numerous opportunities to remind the jury of the flawed character of the chief witness for the prosecution.
 
 
 17
 A related claim of error concerns the court's refusal to make available to the defendants the grand jury testimony of Caracappa concerning the prior transportation of a load of aspirin. This again was a matter not directly related to the transactions involved in the conspiracy for which the defendants were being tried. The Supreme Court has held that the right to have access to the grand jury testimony of a trial witness is based on a showing of 'particularized need.' Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). In Dennis the Court cautioned that it is especially important in conspiracy cases that all information which may lead to the truth be made available. A request for the grand jury testimony of a trial witness is addressed to the discretion of the trial court. United States v. Johnson, 414 F.2d 22 (6th Cir. 1969), cert. denied, 397 U.S. 991, 90 S.Ct. 1112, 25 L.Ed.2d 399 (1970); United States v. Luxenberg, 374 F.2d 241 (6th Cir. 1967). We conclude that in the present case the defendants failed to show a particularized need for the requested transcript and that the trial judge did not abuse his discretion or close an avenue to the truth in denying their request.
 
 
 18
 The witness Caracappa created another issue when he falsely answered on cross-examination that his home at the time of trial was Kansas City. At the first recess following this testimony one of the prosecuting attorneys advised defense counsel and the court that this was not a true statement and that Caracappa was attempting to keep his present location hidden. At the same time the prosecuting attorney offered to recall Caracappa so that the matter could be explored in the presence of the jury. The defense declined to agree to his recall to the witness stand in view of the statement by the prosecuting attorney that he would ask Caracappa to explain the reason for giving a false answer. We have held that the prosecution may not knowingly suborn false testimony or suppress exonerating evidence. United States v. Young, 426 F.2d 93 (6th Cir.), cert. denied 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970). It is established that a witness may be asked his residence on cross-examination. The purpose of this is to learn of his community identification so that other evidence may be sought concerning his reputation for veracity. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). In view of the fact that Caracappa had recently left Chicago and would not have likely established a reputation in his new domicile and the fact that his general character was so fully explored in the trial, we do not believe that his false answer produced prejudicial error. This is particularly true since the government immediately disclosed the fact of its falsity to the court and defense counsel and offered to bring the witness back to the stand for further cross-examination.
 
 
 19
 It is contended that the trial court abused its discretion in permitting the prosecution to cross-examine and impeach the witness Wakeford who had been called by the government. The problem is that the defendants opened the door to this particular action by asking Wakeford on cross-examination whether he had any reason to believe, at the time he was involved in movement of the aspirin with the defendant Silverman, that the cargo was stolen. This question did not relate to any testimony on direct examination and the prosecutor claimed that the negative answer of Wakeford took him by surprise. He was then permitted to question Wakeford as if under cross-examination with respect to a meeting between Wakeford, the prosecuting attorney and an FBI agent named O'Neil. When Wakeford denied that he had made a statement to the prosecuting attorney and FBI agent that he believed the aspirin was stolen, agent O'Neil was called and permitted to testify that Wakeford had made such a statement in his presence in the presence of the prosecutor. If the purpose of getting this testimony before the jury had been to prove the conspiracy, it would have been improper. United States v. Sherfey, 384 F.2d 786 (6th Cir. 1967). Any statement of Wakeford after the charged conspiracy had terminated would not be admissible to prove either the conspiracy or any substantive offense. However, it is clear from the context that agent O'Neil was permitted to testify solely for the purpose of impeaching the testimony of the witness Wakeford and the jury was so advised in the charge. In view of the fact that the subject of Wakeford's knowledge or state of mind at the time of the transactions which he testified to was first raised by the defendants, it was not error to permit impeaching testimony following a claim of surprise by the prosecution.
 
 
 20
 The defendants contend that the trial court committed two errors in its application of the Jencks Act, 18 U.S.C. 3500. The first incident again related to portions of Caracappa's grand jury testimony which concerned a different transaction from the one which was on trial. Also involved was an FBI statement which had been taken from Caracappa. The prosecuting attorney advised the court that he had given to defense counsel the portions of the grand jury transcript and Caracappa's FBI statement relating to the charges which were then being tried. The remainder of the grand jury transcript of Caracappa's testimony and the FBI statement were furnished to the trial judge for an in camera inspection. That is, the portions relating to the charges then on trial were turned over to the defense and the entire statement was handed to the court for in camera inspection. We find no abuse of discretion in the decision of the trial judge in denying the request of the defendants that the entire grand jury transcript and complete FBI statement be delivered to them. The Supreme Court has said that application of the Jencks Act depends on the good sense and experience of trial judges subject to 'appropriately limited review of appellate courts.' United States v. Augenblick, 393 U.S. 348, 355, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969). Our examination of the proceedings indicates that the defendants in this case were probably furnished with more material than is actually required by the Jencks Act. The court properly held that the additional requested material was not required to be furnished.
 
 
 21
 The other alleged Jencks Act error related to the refusal of the court to strike the testimony of officers who admitted that they had destroyed notes which had been made at the time of a surveillance about which they were testifying. The Jencks Act applies to a 'substantially verbatim recital' of an oral statement by a witness and does not apply to an officer's rough notes. United States v. Augenblick, supra. This court has held that when an agent destroys his rough notes of an interview with a person after using the notes to write a statement or report, it is not error to permit the agent to testify. United States v. Lane, 479 F.2d 1134 (6th Cir. 1973); United States v. Hensley, 374 F.2d 341 (6th Cir.), cert. denied, 388 U.S. 923, 87 S.Ct. 2139, 18 L.Ed.2d 1373 (1967); United States v. Fruchtman, 421 F.2d 1019 (6th Cir.), cert. denied, 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed.2d 86 (1970). The defendants rely upon United States v. Lonardo, 350 F.2d 523 (6th Cir. 1965), but this case does not apply because of a basic factual difference. In Lonardo, a government agent deliberately destroyed a stenographic transcript of an interview with a witness and there was evidence of a vital discrepancy between the destroyed transcript and the final statement which was furnished.
 
 
 22
 Several complaints are made about the charge given to the jury by the court and the refusal of the court to give certain requested instructions. The defendant Bartkus requested an instruction that the relationship of buyer and seller, in the absence of an understanding beyond the mere sales agreement, does not prove a conspiracy to deal in stolen property even if both parties know of the stolen character of the goods. The language of the requested instruction is from United States v. Varelli, 407 F.2d 735 (7th Cir. 1969) quoting from an earlier Seventh Circuit case. While not disputing the fact that there may be a transaction between a buyer and seller involving goods which both know are stolen without the existence of a conspiracy, we do not believe that such an instruction was necessary in this case. The court very carefully recited the elements required for a finding of conspiracy and membership in the conspiracy by any of the defendants, and in following these instructions the jury could not have found a defendant guilty unless it believed beyond a reasonable doubt that he was part of the overall conspiracy and not just a purchaser or seller of stolen goods. The buyer-seller theory was fully developed by counsel and the requested instruction was not required in order for the jury to be properly charged with respect to the findings it was required to make in determining the innocence or guilt of the defendants. When considered as a whole, the jury charge in this case fairly and accurately stated the law applicable to the charges for which the defendants were being tried. United States v. Andrews, 347 F.2d 207 (6th Cir.), cert. denied, 382 U.S. 956, 86 S.Ct. 431, 436, 15 L.Ed.2d 360 (1965).
 
 
 23
 It is necessary to consider separately one other allegation of trial error. The transcript reveals the following dialogue which occurred during the direct examination of the witness Caracappa:
 
 
 24
 Q Incidentally, I think-- well, let me ask you this-- is this the first time that you had met Mr. Bartkus?
 
 
 25
 A Yes.
 
 
 26
 Q And was Mr. Bartkus introduced to you in any particular way?
 
 
 27
 A I was reluctant to talk to Mr. Kahn in front of Mr. Bartkus and he was introduced--
 
 MR. ZANGLIN: I object
 
 28
 MR. ROSENTHAL: Objection as not responsive, your honor.
 
 
 29
 THE COURT: The court will sustain the objection.
 
 
 30
 Q (By Mr. Kelley, continuing) Did Mr. Kahn introduce Mr. Bartkus to you in some way?
 
 
 31
 A Yes, he did.
 
 
 32
 Q What did he say?
 
 
 33
 A He said, you can do business in front of this man.
 
 
 34
 Q Did he describe Mr. Bartkus in any particular way?
 
 
 35
 MR. CHANDLER: I object again, your honor, on the grounds there is no opportunity for a confrontation of Mr. Kahn in this matter, unless he is called as a witness.
 
 
 36
 MR. KELLEY: Well, that is the same objection, if the court please, and I think your honor has ruled on it.
 
 
 37
 THE COURT: All right. You may proceed.
 
 
 38
 MR. CHANDLER: I would further say, your honor, that the description Mr. Kahn gives of Mr. Bartkus is pure hearsay and could not be in any way in furtherance of the conspiracy.
 
 
 39
 Q (By Mr. Kelley, continuing) Did he introduce him in any particular way, Mr. Caracappa?
 
 
 40
 A Yes, he did.
 
 
 41
 Q What did he say?
 
 
 42
 A He said he was a buyer of stolen merchandise.
 
 
 43
 Q All right. Was there at that time-- we are still talking about--
 
 
 44
 MR. CHANDLER: Your honor, I would ask the jury be excused.
 
 
 45
 In argument which followed out of the presence of the jury the prosecution sought to justify its introduction of the statement which characterized the defendant Bartkus as a buyer of stolen merchandise on several grounds. It was claimed that the statement was made in the presence of Bartkus and therefore could be used in his trial, and it was further contended that the testimony of Caracappa was admissible as a statement made by a co-conspirator in furtherance of the conspiracy. Bartkus took the position that the statement was introduced as evidence of his character and that the rule against the introduction of such evidence in a criminal case is absolute. On appeal Bartkus principally relies upon Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), in which the Supreme Court said:
 
 
 46
 'Courts that follow the common law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt . . .. The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weight too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.' At 475-476, 69 S.Ct. at 218.
 
 
 47
 This universally recognized rule has often been applied by this court. See, e.g., United States v. McCarthy, 470 F.2d 222 (6th Cir. 1972).
 
 
 48
 The government maintains that this testimony falls within a recognized exception to the general rule set forth in Michelson v. United States, supra. The purpose of the statement by Kahn to Caracappa, it is asserted, was to assure Caracappa that it was safe to discuss the transportation of the stolen goods in the presence of Bartkus, and the movement of the stolen merchandise was necessary to the success of the conspiracy. It is the position of the government that relevant evidence of a fact or statement done or made in furtherance of the conspiracy is not inadmissible because it incidentally discloses criminal conduct on the part of a defendant. Reliance is placed on cases which permit such evidence to show a pattern of conduct. E.g., Nye & Nissen v. United States, 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919 (1949). We do not believe the evidence that Bartkus engaged in other criminal activities on other occasions came within any exception to the Michelson rule. Such evidence is extremely damaging and the prejudice cannot be removed even by curative instructions. United States v. Rudolph, 403 F.2d 805, 807 (6th Cir. 1968). As with the reference to the aspirin being stolen, this error related only to Bartkus and the rights of the other defendants were not affected by it.
 
 
 49
 We have considered the other issues raised in the briefs and arguments of the defendants, including the allegation of a defective search warrant, and find them to be without merit. This was a difficult case for the district court. Although it had been agreed that the objections and statements of counsel for one defendant would be received as applying to all, there were repeated instances when all four attorneys addressed the court on a single point. Nevertheless, District Judge Damon J. Keith consistently treated everyone with courtesy and patience. He ruled promptly when required to do so and reserved rulings in instances where this did not delay the trial and further research by the attorneys appeared desirable. With the exception of those matters relating to the defendant Bartkus which are set forth herein, we have found no prejudicial error in the conduct of the trial. It is therefore ordered that the judgments of the district court in No. 73-1334 (Lee Stephens), No. 73-1336 (Milton Silverman) and No. 73-1337 (Sam Norber) are affirmed and the judgment in No. 73-1335 (Alfonse Bartkus) is reversed and that the appellant Bartkus be granted a new trial.
 
 
 
 [1]
 The basis for this assertion is unclear. Kahn had pled guilty to the charges against him and was not on trial